2007-NMCA-094

164 P.3d 982

**Jose PINCHEIRA and Olivia Pincheira, Plaintiffs–Appellees,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant–Appellant.**

**No. 26,044.**

Court of Appeals of New Mexico.

June 13, 2007.

Certiorari Granted, No. 30,490, July 27, 2007.

Berardinelli Law Firm, David J. Berardinelli, LLC, Santa Fe, NM, for Appellees.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., Lisa Mann, Jennifer A. Noya, Albuquerque, NM, Steptoe & Johnson LLP, Bennett Evan Cooper, Jon T. Neumann, Phoenix, AZ, for Appellant.

## OPINION

CASTILLO, Judge.

{1} In this case, we are presented with a question of first impression: What is the procedure to be followed by a New Mexico trial court in evaluating the protection, if any, to be given to an alleged trade secret during discovery? This question comes to us on the entry of a default judgment on liability

against Defendant, Allstate Insurance Company, which holds Defendant in contempt for failure to comply with the trial court's orders requiring full production of documents requested by Plaintiffs, Jose and Olivia Pincheira, (McKinsey documents). Defendant challenges the entry of the default judgment as a contempt sanction and raises the following issues on appeal: (1) whether the trial court abused its discretion in requiring Defendant to produce the McKinsey documents without a protective order or without an evidentiary hearing and (2) whether the trial court abused its discretion in entering a default judgment as a sanction for Defendant's technical contempt. We reverse and remand on the first issue. For that reason, we do not reach the merits of the second issue in this case.

## I. BACKGROUND

{2} Although the question on appeal is limited to the disposition of a discovery request, we provide context for our analysis by first setting out a detailed history of the events leading up to the appeal.

### A. Preliminary Case

{3} This case began almost ten years ago, when Plaintiffs were injured by an uninsured motorist in an accident that occurred on December 2, 1997. Plaintiffs made a claim for uninsured motorist (UM) coverage, but based on Plaintiffs' written rejection of UM coverage when they purchased their insurance policy, Defendant denied the claim. Plaintiffs filed a declaratory relief action against Defendant and its agent, the Yount Agency. Trial was held on the question of coverage. The trial court determined that the rejection of UM coverage was invalid because it had been based on poor and erroneous agent information and, further, because the rejection had occurred in a manner that violated public policy, applicable case law, and the insurance statutes, rules, and regulations of New Mexico. Based on this determination, the trial court concluded that the Plaintiffs had UM coverage, and the court therefore granted declaratory judgment against Defendant and the Yount Agency. Ultimately,

Plaintiffs recovered $30,000 in UM coverage for the accident, plus attorney fees.

### B. Case on Appeal

{4} We now turn to the case on appeal. Following the declaratory judgment, a complaint (Complaint) was filed by Plaintiffs and other parties, who have since been dismissed from the case and are not part of this appeal. The Complaint named Defendant and members of the Yount Agency as defendants and sought damages for fraud, constructive fraud, civil conspiracy to defraud or violate statute, violation of fiduciary duty, professional negligence by an insurance agent, failure of the agent to procure insurance, insurance bad faith, bad faith claims practices, violations of insurance code, and unfair trade practices. Plaintiffs' basic position is that Defendant and its agents, as directed through their training process, routinely provide false or misleading information concerning the benefits and advantages of UM coverage in order to induce retirees like Plaintiffs to reject UM coverage when purchasing their automobile insurance.

{5} The record in this appeal consists of several volumes related to the vigorous litigation of Plaintiffs' claims. Plaintiffs and Defendant filed discovery requests, objections, and motions to compel and requested hearings on their motions. Orders were entered. The parties also filed numerous non-discovery-related motions that were acted upon by the trial court. The issues on appeal are limited to Plaintiffs' second request for production of documents, specifically the McKinsey documents. Because the request was made to Defendant only, there are no further references in this opinion to the members of the Yount Agency who are the remaining defendants in the case. We turn to the discovery process related to the McKinsey documents.

### C. Request for Production of the McKinsey Documents

{6} On July 17, 2001, Plaintiffs served Defendant with their second request for production of documents. In late August 2001, Defendant timely responded to the request and made numerous objections to the docu-

ments requested. Because the objection to this request and the pleadings emanating from the objection form the basis for the parties' arguments on appeal, we set out the contents of the applicable pleadings.

{7} The dispute on appeal relates exclusively to Plaintiffs' Request for Production No. 5 (Request No. 5), which reads as follows:

> Please produce a true and correct copy of the CCPR implementation manual together with each and every amendment or supplement thereto issued or published or created from 1994 to the present; in connection therewith please also produce each and every report, blue book, paper or document in hard copy or digital form produced by or contributed to by McKinsey & Company which refers to or discusses the creation of CCPR for [Defendant], the intent of CCPR, the goals of CCPR or the implementation of CCPR, and which was generated at any time between 1990 and 1996.

{8} Defendant objected to Request No. 5, based "on the grounds that it seeks confidential or proprietary information or information, some of which is protected by contractual licensing agreements, and [that] Plaintiffs have previously refused to enter into an appropriate protective order in this case." Defendant also objected on the grounds that the request was "overly broad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, insofar as it requests information having nothing to do with rejection of uninsured motorist coverage, so the information sought has nothing to do with the allegations of Plaintiffs' Complaint."

{9} In early September 2001, Plaintiffs filed a motion to compel, followed by a memorandum brief in support of the motion. In the memorandum, Plaintiffs acknowledged that Defendant's objections to Request No. 5 were based on Defendant's contention that the McKinsey documents were trade secrets and that their production would be burdensome, but Plaintiffs nevertheless argued that disclosure would be appropriate in these circumstances.

{10} In late September 2001, Defendant responded by filing its memorandum in opposition to Plaintiffs' motion to compel. In this motion, Defendant generally opposed production of the McKinsey documents on a number of grounds but requested that if the court did order production of these particular documents, it also enter an order to protect their confidentiality as trade secrets. The opening paragraph summarizes Defendant's position:

> As discussed more fully below, Plaintiffs' Second Requests are irrelevant and overly broad, unduly burdensome, expensive and exceed the scope of permissible discovery under SCRA 1–026. Plaintiffs' Second Motion to Compel should, therefore, be denied in its entirety. Alternatively, in the event this Court orders production of any documents responsive to Plaintiffs' Second Request No. 5, those documents are to be produced only subject to conditions of strict confidentiality and non[ ]disclosure, because they contain trade secrets and proprietary information.

{11} Part IV of Defendant's memorandum response discusses Defendant's objections to Request No. 5, in relative detail, including citation of case law and attachment of the affidavit of Christine Sullivan, Assistant Vice President in the Property–Casualty Claim Service Organization at Defendant's home office. The memorandum response argues that the McKinsey documents specifically qualify as trade secrets under New Mexico's Uniform Trade Secrets Act (TSA), NMSA 1978, §§ 57–3A–1 to –7 (1989). In addition, the memorandum cites the common law factors used in determining whether a party possesses a trade secret entitled to protection as set forth in the Restatement (First) of Torts § 757 cmt. b, at 6 (1939). Sullivan, in her affidavit, asserts that the McKinsey documents "are confidential, proprietary, and trade secrets [sic] and are treated as such by [Defendant]." Sullivan states that

> [Defendant] believes its procedures for investigating, handling, adjusting, and evaluating casualty claims give [Defendant] an advantage in attracting and keeping policyholders which competitors do not share.

> . . . .

[Defendant] believes these procedures give it a competitive edge with respect to procedures used by other insurance companies with which it competes, and provides a significant benefit to its shareholders and policyholders. This benefit, and the investment that created it, would be lost if these materials were obtained or disclosed to ... competitors.

{12} The affidavit also details the measures Defendant uses to maintain the confidentiality of the information requested, including strict limiting of access, printing confidentiality notices on the documents, entering into agreements of non-dissemination with employees, and keeping the materials in secure locations. In the conclusion of the response memorandum, Defendant requested that the trial court deny the second motion to compel or, alternatively, in accordance with Rule 1–026(C)(7) NMRA and Rule 11–508 NMRA, subject any produced documents to conditions of strict confidentiality and nondisclosure because they contain trade secrets and proprietary information. Plaintiffs filed no reply to Defendant's response memorandum or to the Sullivan affidavit.

### D. Hearings and Order

{13} As we explained above, the parties had filed a number of motions before Plaintiffs filed their second request for production. The trial court set hearing dates of October 25 and 30, 2001, to consider Defendant's pending motions, which included Defendant's discovery motions and other motions not pertinent to this appeal.

{14} Plaintiffs' motion to compel production of the McKinsey documents was not listed as an item to be considered on those hearing dates. At the hearing on October 30, 2001, the parties agreed to address Plaintiffs' motion to compel production of the McKinsey documents. Plaintiffs challenged Defendant's position that the McKinsey documents were entitled to protection as trade secrets. Plaintiffs presented documentary evidence and live testimony. Defendant objected to introduction of that evidence. Defendant's objections were overruled.

{15} Given that Plaintiffs had not challenged the Sullivan affidavit prior to the hearing, Defendant requested the opportunity to present its own evidence and asked the trial court to reconvene the hearing at a later date for that purpose. Alternatively, Defendant requested that the trial court allow production of the documents, subject to conditions of confidentiality and use only in this case. Ruling that the Sullivan affidavit was too general and conclusory to support a protective order under the "good cause" standard established in *Krahling v. Executive Life Insurance Co.*, 1998–NMCA–071, ¶¶ 14–17, 125 N.M. 228, 959 P.2d 562, the trial court orally ordered Defendant to produce the McKinsey documents without protection.

{16} On November 9, 2001, the parties filed a number of motions. Plaintiffs filed notice that on November 13, 2001, presentment of a form order compelling production of the McKinsey documents would take place. Defendant filed an expedited motion for evidentiary hearing, a motion for reconsideration of Plaintiffs' second motion to compel unprotected production of the McKinsey documents, and a motion for stay or interim protective order, pending production after the evidentiary hearing. In its memorandum in support of these motions, Defendant distinguished *Krahling* and requested that an evidentiary hearing be set on the merits of whether the McKinsey documents were entitled to a protective order. Defendant attached an offer of proof.

{17} At the presentment hearing, the trial court signed Plaintiffs' form of order. This order required full production of the McKinsey documents by December 31, 2001, without protection (November 2001 Order). In addition, the trial court set two hearings: one to be held December 7, 2001, on Defendant's motion to reconsider and a full-day evidentiary hearing to be held December 28, 2001.

{18} After the presentment hearing, the parties filed additional pleadings, relating to the issues to be heard during the December hearings. Only the first hearing was held, and this resulted in an order filed on December 18, 2001, which denied Defendant's motion for reconsideration as "not well taken"

and canceled the evidentiary hearing set for December 28, 2001.

## E. Interim Protective Order and Appeals

{19} Also on December 18, 2001, Defendant requested a stay to maintain the status quo, pending appellate review by petition for writ of error to this Court from the November 2001 Order. Alternatively, Defendant argued for an order to produce the McKinsey documents, subject to an interim protective order. Plaintiffs objected.

{20} A hearing on the motion for stay was held on December 27, 2001, after which, on January 7, 2002, the trial court ordered Defendant to produce the McKinsey documents, subject to an interim protective order, which allowed Plaintiffs to utilize these documents for purposes of this litigation but precluded dissemination of the documents to any parties outside the litigation (Interim Protective Order). It further stated that the Interim Protective Order "shall remain in effect until fourteen days following the completion of appellate review of the questions presented in [Defendant]'s Petition for Writ of Error." Defendant produced the McKinsey documents on January 2, 2002, with a confidentiality overlay.

{21} On January 25, 2002, this Court granted the petition for writ of error and assigned the case to the general calendar. The writ was quashed in a formal opinion filed on January 30, 2004, *Pincheira v. Allstate Insurance Co.* (*Pincheira I*), 2004–NMCA–030, ¶ 7, 135 N.M. 220, 86 P.3d 645, wherein this Court determined that the petition for writ of error was untimely filed. On the same day, this Court also filed *King v. Allstate Insurance Co.*, 2004–NMCA–031, ¶¶ 13, 16–18, 135 N.M. 206, 86 P.3d 631, holding that orders compelling discovery cannot be reviewed by writ of error under Rule 12–503 NMRA. *King* also held that an order compelling discovery can only be appealed as an interlocutory appeal under Rule 12–203 NMRA or as an appeal as of right from a civil or criminal contempt sanction imposed for refusing to comply with a discovery order. *King*, 2004–NMCA–031, ¶ 19, 135 N.M. 206, 86 P.3d 631.

{22} The Interim Protective Order expired fourteen days after the March 5, 2004, denial of certiorari in *Pincheira I. Pincheira v. Allstate Ins. Co.*, 2004–NMCERT–003, 135 N.M. 319, 88 P.3d 261. On March 11, 2004, within fourteen days of denial of the petition for certiorari, Defendant moved for trial court clarification or extension of the Interim Protective Order so that Defendant could obtain an appeal of the November 2001 Order. In accordance with the procedure recognized in *King*, Defendant requested entry of an order holding it in contempt under NMSA 1978, § 39–3–15(A) (1966), for respectfully refusing to comply with Judge Encinias's discovery order.

{23} Plaintiffs' counsel returned to Defendant's counsel the McKinsey documents, which had been marked "confidential" and produced on January 2, 2002, under the Interim Protective Order. Plaintiffs' counsel also filed a notice of return of documents, stating that "Plaintiffs have returned these [previously produced] documents and demanded production of clean, legible copies without the confidentiality overlay." Plaintiffs also filed a petition for an order to show cause why default judgment under Rule 1–037 NMRA should not be entered against Defendant for its "contumacious" and sanctionable use of the contempt method specified in *King*.

{24} On June 4, 2004, the trial court entered an order requiring Defendant to produce an unprotected set of the McKinsey documents; the order stated that if Defendant refused, the trial court would enter default judgment on liability (June 2004 Order). Defendant declined to produce the unprotected documents for the express purpose of obtaining a contempt sanction and thereby securing appellate review. On July 8, 2004, the trial court entered default judgment on liability and reserved all damages issues for trial. Defendant filed a notice of appeal from the default judgment.

{25} In this Court, we dismissed the appeal because the default judgment on liability was a nonfinal order, since the damages issues remained. The Supreme Court granted Defendant's petition for writ of certiorari, and after full briefing and oral argument, the

Supreme Court remanded the case to the trial court on May 20, 2005, for the purpose of determining "whether its default judgment on liability, issued July 8, 2004, was intended as an order of contempt within the meaning of *King* [ ]." On remand, after full briefing and hearing on July 15, 2005, the trial court entered an order clarifying that its default judgment on liability was a contempt sanction intended to permit Defendant to take an appeal as provided in *King*. On August 11, 2005, Defendant timely filed its notice of appeal from this ruling.

## II. DISCUSSION

### A. Scope of Review

{26} Plaintiffs requested production of the McKinsey documents in their Request No. 5, served on Defendant on July 17, 2001. The trial court resolved the parties' disputes about production when it ordered Defendant to produce the McKinsey documents without protection in the November 2001 Order and again in subsequent orders dated December 18, 2001, January 7, 2002, and June 4, 2004. Because the subsequent orders relate to the same subject matter—production of the McKinsey documents without protection—review of the November 2001 Order will necessarily resolve the issues related to the subsequent orders.

### B. Standard of Review

{27} The standard of review for discovery orders is abuse of discretion. *Piña v. Espinoza*, 2001–NMCA–055, ¶ 12, 130 N.M. 661, 29 P.3d 1062; *see also Pub. Serv. Co. of N.M. v. Lyons*, 2000–NMCA–077, ¶ 10, 129 N.M. 487, 10 P.3d 166. To the extent a trial court's discretionary decision is premised on the construction of a privilege, however, review of that decision presents a question of law, subject to de novo review. *Lyons*, 2000–NMCA–077, ¶ 10, 129 N.M. 487, 10 P.3d 166; *see also N.M. Right to Choose/NARAL v. Johnson*, 1999–NMSC–028, ¶¶ 6–8, 127 N.M. 654, 986 P.2d 450.

### C. Discovery Rules and the Trade Secret Privilege

{28} Defendant's position is that the McKinsey documents are protected by privi-

lege because they are trade secrets and that the trial court should have subjected their production to a protective order. We begin by reviewing the rules and statutes that inform our decision in this case. Rule 1–026(B)(1) sets out the test for what information is discoverable: "to be discoverable, information must be (1) relevant to the subject matter involved in the pending action and (2) not privileged." *Piña*, 2001–NMCA–055, ¶ 14, 130 N.M. 661, 29 P.3d 1062 (internal quotation marks and citation omitted). If the information requested is privileged, it is not subject to discovery, except as allowed by the privilege. "The rules with respect to privileges apply at all stages of all actions, cases and proceedings." Rule 11–1101(C) NMRA.

{29} Privileges in New Mexico are limited to those recognized by the Constitution, the Rules of Evidence, or other rules of the Supreme Court. *See Estate of Romero v. City of Santa Fe*, 2006–NMSC–028, ¶ 8, 139 N.M. 671, 137 P.3d 611 (noting the differences between privileges under the Federal Rules of Evidence and the New Mexico Rules of Evidence); *see also Ammerman v. Hubbard Broad., Inc.*, 89 N.M. 307, 312, 551 P.2d 1354, 1359 (1976) (holding that as reflected in Rule 11–501 NMRA, privileges are limited to those required by the state constitution and the rules promulgated by the New Mexico Supreme Court). While the New Mexico Rules of Evidence generally follow the Federal Rules of Evidence, "New Mexico's approach to privileges is a special product of our state law jurisprudence." *Lyons*, 2000–NMCA–077, ¶ 12, 129 N.M. 487, 10 P.3d 166.

{30} New Mexico has a specific rule of evidence that establishes the trade secret privilege:

**11–508. Trade secrets.**

A person has a privilege, which may be claimed by the person or the person's agent or employee, to refuse to disclose and to prevent others from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. When disclosure is directed, the court shall

take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require.

Rule 11–508. The language of Rule 11–508 is almost identical to Supreme Court Standard 508, a proposed rule of evidence that was promulgated by the United States Supreme Court. 26 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, Rejected Rule 508, at 282, & § 5641, at 284 (1992). However, this rule was never adopted by Congress and is not part of the Federal Rules of Evidence. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 611 (Tex.1998) ("Congress did not adopt Standard 508 as a federal rule of evidence[.]").

{31} Now we turn to trade secrets. The Restatement (First) of Torts § 757 provides one definition of "trade secret." In relevant portion, Section 757 provides the following:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

Restatement (First) of Torts § 757 cmt. b, at 5. The Restatement also lists the following six factors, which can be used to determine whether certain information constitutes a trade secret:

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the owner] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended . . . in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757 cmt. b, at 6.

{32} In 1989, the New Mexico Legislature recognized the need to protect trade secrets and enacted the TSA. Under the TSA, "trade secret" is defined as

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Section 57–3A–2(D).

{33} In trade secret litigation, a court's role in protecting trade secrets is found in Section 57–3A–6. While no specific method of protection is mandated, the TSA directs a court to "preserve the secrecy of an alleged trade secret by reasonable means" and lists several methods by which this can be accomplished: "granting protective orders in connection with discovery proceedings, holding in camera hearings, sealing the records of the action and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval." *Id.*

{34} Further, we observe that trade secrets are protected from disclosure under the Inspection of Public Records Act, NMSA 1978, §§ 14–2–1 to –12 (1947, as amended through 2005). "Every person has a right to inspect public records of this state except . . . trade secrets[.]" Section 14–2–1(A)(6). While we recognize that this case does not deal with the inspection of public records, this exception is another example of the strong public policy in New Mexico supporting the confidentiality of trade secrets.

**D. Privilege and Policy in Favor of Liberal Discovery**

{35} With this as a background, we evaluate the trade secret privilege in light of the long-recognized policy in favor of liberal and open discovery. *See, e.g., Salitan v. Carrillo*, 69 N.M. 476, 480–81, 368 P.2d 149,

152 (1961) (stating that the purposes of the rules of discovery are "[t]o clarify the basic issues between parties[ ] and to ascertain the facts or information as to the existence or whereabouts of facts relative to those issues"). Relevant information that is "not privileged" is discoverable. Rule 1–026(B)(1). Rule 11–508 specifically recognizes the trade secret privilege and the right of a trade secret's owner, an agent, or an employee to refuse to disclose and prevent others from disclosing the trade secret. Rule 1–026(C)(7) recognizes that a protective order may be entered to protect a trade secret, as well as other confidential information, from disclosure or to permit disclosure in a designated way. Our case law has long recognized that liberal discovery procedures are to be construed consistent with recognized privileges. *See, e.g., Salitan,* 69 N.M. at 481, 368 P.2d at 152 ("The way is now clear, *consistent with recognized privileges,* for the parties to obtain the fullest possible knowledge of the issues and facts before trial." (emphasis added)). With these rules and statutes and this case law as our background, we now address the issues in this case.

### E. New Mexico Rule 11–508, the Trade Secret Privilege

{36} New Mexico courts have not previously had occasion to address the application of Rule 11–508 or its interplay with Rule 1–026(C)(7). We begin with the language of Rule 11–508. As explained above, this language was rejected by Congress and therefore is not included in the Federal Rules of Evidence. It was adopted, however, in some version by several states including New Mexico. *In re Cont'l,* 979 S.W.2d at 611 (citing to twenty states that have adopted some version of the rejected Rule 508); *see* 26 Wright & Graham, *supra,* § 5641, at 284–286 (discussing the states that have adopted a form of the rejected Rule 508).

{37} We observe that in federal court, a trade secret is not privileged, and therefore the party resisting discovery has no other option except to file a motion for protection under Federal Rule of Civil Procedure 26(c), which requires that the movant show "good cause" for the motion. Under New Mexico law, however, trade secrets are granted a privilege; therefore, according to the language of Rule 1–026(C), the party resisting discovery may object to the discovery request by asserting the protection of the privilege without having to file a motion for protective order. *See* 26 Wright & Graham, *supra,* § 5642, at 290 ("[I]f the trade secret doctrine is now a 'privilege,' the owner need not move for a protective order under Civil Rule 26(c)(7)[.]"). This does not preclude the filing of a motion for protective order, but rather provides an additional option to a party who does not want to disclose a trade secret.

{38} We first look to other jurisdictions with trade secret privileges similar to New Mexico's for cases that have considered the scope of the rule. We begin with *Bridgestone/Firestone, Inc. v. Superior Court,* 7 Cal.App.4th 1384, 9 Cal.Rptr.2d 709 (1992). Under the California Rules of Evidence, "the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice." Cal. Evid.Code § 1060 (West, Westlaw through Ch. 1 of 2007 Reg. Sess. urgency legislation). This language is similar to the language in Rule 11–508, the New Mexico trade secret privilege. The California privilege protects a "trade secret" as defined in part of California's Uniform Trade Secrets Act, Cal. Civ.Code § 3426.1(d) (West, Westlaw through Ch. 1 of 2007 Reg. Sess. urgency legislation). This is the same definition of "trade secret" as that found in New Mexico's TSA. Section 57–3A–2(D). In both states, the allowance of the privilege—the refusal to disclose—must not "tend to conceal fraud or otherwise work injustice." Rule 11–508; Cal. Evid.Code § 1060. *See generally State Farm Fire & Cas. Co. v. Superior Ct.,* 54 Cal.App.4th 625, 62 Cal.Rptr.2d 834, 851–52 (1997) (allowing disclosure of a trade secret because the facts supported disclosure under the fraud or injustice exception and because the information was so minimal that there was no danger it could be used by another to obtain economic value in competition with the insurance company).

{39} As explained in *Bridgestone,* the party claiming the privilege has the initial burden of establishing its existence, i.e., that the information is a trade secret. 9 Cal.Rptr.2d at 713. Thereafter, the party seeking disclosure "must make a prima facie, particularized showing that the information sought is relevant and necessary to the proof of, or defense against, a material element" of the case. *Id.* The California appellate court looked to the phrase " 'work injustice' " to determine the burden to be met by the requesting party; proof that the trade secret is "generally relevant" to the subject matter of the action or helpful in preparation of a party's case is insufficient. *See id.* at 712. Rather, allowance of the privilege may be deemed to " 'work an injustice' " only if it appears the information sought is directly relevant to a material element of the cause of action (or defense) and necessary because the party opposing the claim of privilege would be unfairly disadvantaged in proving its case, absent access to the trade secret. *Id.* at 713. It must be reasonable to conclude under the circumstances that the information sought is essential to a fair resolution of the lawsuit. *Id.* Once the party requesting disclosure establishes relevance and necessity, the burden then shifts back to the party claiming the privilege to demonstrate why a protective order would not suffice (e.g., permitting restricted disclosure to specified persons and solely for purposes of the lawsuit). *Id.* Less intrusive alternatives to disclosure may be proposed by either party, but the party claiming the privilege has the burden of demonstrating "that an alternative to disclosure will not be unduly burdensome to the opposing side and that it will maintain the same fair balance in the litigation that would have been achieved by disclosure." *Id.* at 713–14.

{40} Florida, which also has a trade secret privilege with language similar to the New Mexico privilege, considered the scope of the privilege in *Rare Coin–It, Inc. v. I.J.E., Inc.,* 625 So.2d 1277 (Fla.Dist.Ct.App.1993) (per curiam). *Compare* Fla. Stat. § 90.506 (West, Westlaw through Ch. 1(End) of the 2007 Special 'A' Session of the Twentieth Legislature) *with* Rule 11–508. Florida applies a test similar to the California test: when, based on the assertion of a trade secret privilege, a party resists production, the trial court must first determine whether the requested production constitutes a trade secret; if so, the burden shifts to the party seeking production to show reasonable necessity for the requested materials. *Rare Coin–It,* 625 So.2d at 1278. In *Rare Coin–It,* the parties agreed that the source code requested was a trade secret, but the party requesting the discovery failed to show reasonable necessity for its production; therefore, the Florida appellate court quashed the order granting discovery of the source code. *Id.* at 1279.

{41} Texas, too, has a trade secret privilege similar to that of New Mexico. *Compare* Tex.R. Evid. 507 *with* Rule 11–508. The Texas Supreme Court considered the scope of the privilege in *In re Continental.* Relying on *Bridgestone* and *Rare Coin–It,* the court in *In re Continental* provided the following analysis:

> First, the party resisting discovery must establish that the information is a trade secret. The burden then shifts to the requesting party to establish that the information is necessary for a fair adjudication of its claims. If the requesting party meets this burden, the trial court should ordinarily compel disclosure of the information, subject to an appropriate protective order. In each circumstance, the trial court must weigh the degree of the requesting party's need for the information with the potential harm of disclosure to the resisting party.

*In re Cont'l,* 979 S.W.2d at 613 (footnote omitted); *see also In re Bass,* 113 S.W.3d 735, 737 (Tex.2003) (relying on the test of shifting burdens first enunciated in *In re Continental* ); *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.,* 17 S.W.3d 721, 737 (Tex.App.2000) ("The trial court is to apply a balancing test that employs shifting burdens. The party resisting discovery must first establish that the information is a trade secret. The burden then shifts to the requesting party to show that the information is necessary for a fair adjudication of its claims." (internal quotation marks and citation omitted)).

{42} The court in *In re Continental* referred to the two competing interests that must be accommodated by application of the trade secret privilege; trade secrets are an important property interest, worthy of protection, but at the same time, the judicial system requires that the parties be allowed to elicit facts necessary for a full and fair adjudication of lawsuits. 979 S.W.2d at 612. To reconcile these two important interests, the court looked to the language of the privilege. We, too, look to the language in New Mexico's Rule 11–508. The privilege is available if its allowance "will not tend to conceal fraud or otherwise work injustice." *Id.* Fraud is not an issue in our case; therefore, the privilege will be allowed if it will not otherwise work an injustice on the parties. If total nondisclosure could negatively affect the full and fair adjudication of the lawsuit, the language in the second sentence of the privilege acknowledges the need for disclosure, but with protection. "When disclosure is directed, the court shall take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require." *Id.* We read this to allow the trial court to evaluate the circumstances of the case and fashion a disclosure order that balances the parties' interests.

{43} Although the court in *In re Continental* considered the approach taken in California and Florida to be "consistent with the federal courts' treatment of trade secrets," we are not entirely in agreement. *See* 979 S.W.2d at 612. *In re Continental* appears to base its conclusion on several earlier federal cases that defined the good cause standard in Rule 26(c) in terms of harm and required the resisting party to show that disclosure of the information might be harmful or create a competitive disadvantage for the resisting party. *See Centurion Indus., Inc. v. Warren Steurer & Assocs.,* 665 F.2d 323, 325–26 (10th Cir.1981); *Sentry Ins. v. Shivers,* 164 F.R.D. 255, 256 (D.Kan.1996) (mem. and order). Several of the more recent federal cases, however, have interpreted good cause as requiring the resisting party to show that disclosure of the information will result in " 'a clearly defined and serious injury.' " *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786 (3d Cir.1994) (quoting *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir.1984)). This expanded standard is the same standard articulated in *Krahling, see* 1998–NMCA–071, ¶¶ 14–17, 125 N.M. 228, 959 P.2d 562, the same standard used by the trial court in ordering disclosure, and the same standard Plaintiffs urge us to apply in this appeal.

{44} We need not address the meaning of "clearly defined and serious injury" in the context of trade secrets because we are relying on the language in Rule 11–508, rather than the good cause standard set out in federal Rule 26(c) and in our own Rule 1–026(C). Similarly, we do not deem *Krahling* to be controlling under these circumstances because it addressed the good cause standard in Rule 1–026(C), not the trade secrets privilege in Rule 11–508. The tests enunciated in *Bridgestone, Rare Coin–It,* and *In re Continental* are all based on the language of the privilege itself, which is the approach we adopt in New Mexico. The analysis we adopt today requires the resisting party to establish the existence of a trade secret but does not require that proof of harm be shown as an independent element before the burden shifts. This makes sense to us for several reasons.

{45} Under the federal rules, there is only one method available for protecting trade secrets and that is by filing a motion for good cause shown and requesting a protective order under Rule 26(c). If a party resisting disclosure of trade secrets in New Mexico were required to file for a protective order under Rule 1–026(C) to effect the privilege, the trade secret privilege and the language therein would become meaningless. We decline to adopt such an interpretation. *See State v. Johnson,* 1998–NMCA–019, ¶ 22, 124 N.M. 647, 954 P.2d 79 (holding that this Court rejects interpretations of statutes that render parts of them meaningless or mere surplusage); *see also In re Dominick Q.,* 113 N.M. 353, 354, 826 P.2d 574, 575 (Ct.App. 1992) (stating that rules of statutory construction apply equally to procedural rules). Trade secrets are protected by the privilege and are treated differently from "other confidential research, development or commercial

information," for which Rule 1–026(C) is the only means by which a party can seek protection. Rule 1–026(C)(7). Rule 1–026(C) requires a showing of good cause.

{46} Our reading of *Krahling* further supports this conclusion. In *Krahling,* the trial court denied a motion to lift a discovery order imposing confidentiality requirements on approximately 66,000 documents produced by Honeywell during the course of proceedings. 1998–NMCA–071, ¶¶ 4, 17, 125 N.M. 228, 959 P.2d 562. This Court reversed based on Honeywell's failure to make a showing of good cause and held that good cause is established by showing that disclosure will work a "clearly defined and serious injury" on the party seeking disclosure. *Id.* ¶¶ 15, 21 (internal quotation marks and citations omitted). We made it clear that each of the 66,000 documents had been "uniformly designated as confidential" and, more important, that there had been no assertion of any specific privilege, "including ... trade secrets." *Id.* ¶ 17. This is consistent with our holding today that the assertion of the trade secret privilege requires a different analysis from that used for protection of confidential documents under Rule 1–026(C).

{47} While a party asserting trade secret privilege need not show a "clearly defined and serious injury," the party must, in order to establish the existence of the privilege, demonstrate an element of harm. Under the definition in the TSA, a party must show that the information "derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." Section 57–3A–2(D)(1). If the resisting party establishes that the information sought derives economic value that can be obtained by others if the information is disclosed, then the loss of that value results in harm. Trade secrets are commercially valuable information. *Rhinehart v. Seattle Times Co.,* 98 Wash.2d 226, 654 P.2d 673, 679 (1982) (en banc), *aff'd,* 467 U.S. 20, 37, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). If the requesting party shows that the disclosure of the information is necessary for a fair adjudication of the claims, the trial court balances this need with the harm demonstrated by the resisting party.

{48} Additionally, we observe that under the Restatement, two of the factors used to determine if information is a trade secret also relate to the worth of the information: "(4) the value of the information to [the business] and to [its] competitors" and "(5) the amount of effort or money expended ... in developing the information." Restatement (First) of Torts § 757 cmt. b, at 6. By proving that the information sought is a trade secret, the party resisting discovery automatically provides a basis upon which the trial court can assess harm.

{49} We see a difference between a trade secret and other confidential information. In the case of confidential information, the inquiry is normally limited to the fact that the information sought has been considered and treated as confidential by the party resisting production. The confidentiality of a document does not indicate the harm that might occur if the document is disclosed. Therefore, the Rule 1–026(C) requirement—that a protective order be conditioned on a showing of good cause—would be applicable in the case of confidential information that does not rise to the level of a trade secret.

## F. Remand

{50} Accordingly, we remand this case to the trial court to evaluate production of the McKinsey documents in light of this opinion. As required by Rule 11–508, Defendant must first establish that the information is a trade secret. The burden then shifts to Plaintiffs to establish that the information is necessary for a fair adjudication of their claims. If the parties have met their burdens, the trial court must weigh the degree of Plaintiffs' need for the information with the potential harm of disclosure to Defendant. The language of Rule 11–508 contemplates that if a trial court compels disclosure of the information, the court will ordinarily require that disclosure be subject to appropriate protective measures. Rule 11–508 (directing protective measures to be taken in "the furtherance of justice" when disclosure is directed).

{51} Because this case has a long history, we will attempt to provide some direction to the parties and the trial court on remand. In this case, the trial court appears to have assumed that the McKinsey documents are trade secrets. On this issue, we digress to answer Plaintiffs' contention that this Court has already determined that the documents are not trade secrets because we so noted in our opinion *Pincheira I*, 2004–NMCA–030, ¶ 9, 135 N.M. 220, 86 P.3d 645. There is language in the opinion indicating that counsel for Defendant characterized documents as trade secrets when the trial court had already determined that they were not trade secrets. *Id.* It is not clear if we were referring to the McKinsey documents or other documents. In any event, our language characterizing the documents as either trade secrets or non-trade secrets is dictum. In *Pincheira I*, we did not reach the merits of the underlying appeal because we held that Defendant's petition was untimely and that we thus lacked jurisdiction to entertain it. 2004–NMCA–030, ¶ 7, 135 N.M. 220, 86 P.3d 645. When an appellate court makes statements that are not necessary to its decision, those statements are without the binding force of law. *See Ruggles v. Ruggles,* 116 N.M. 52, 59 n. 8, 860 P.2d 182, 189 n. 8 (1993); *Kent Nowlin Constr. Co. v. Gutierrez,* 99 N.M. 389, 390–91, 658 P.2d 1116, 1117–18 (1982).

{52} In this case, it appears that the Sullivan affidavit does provide support for the trial court's assumption that the McKinsey documents are trade secrets. However, there was evidence to the contrary provided by Plaintiffs and additional evidence that Defendant wanted to present. Further, we note that document age is a factor used to determine whether a document is a trade secret, and these documents have aged since the original assertion of the trade secret privilege. Accordingly, we are remanding this issue to the trial court to begin anew in applying the test enunciated in this case and in determining if and to what extent disclosure should be ordered.

{53} As a final matter, we address the manner in which this should be accomplished. We observe that the McKinsey documents have already been produced under the Interim Protective Order. Consequently, there is no doubt as to what documents are the subject of the Rule 11–508 inquiry. In some jurisdictions, an in camera inspection or an evidentiary hearing is required. *See Uniroyal Goodrich Tire Co. v. Eddings,* 673 So.2d 131, 132 (Fla.Dist.Ct.App.1996) (per curiam) (remanding to the trial court with instructions to "conduct an in camera hearing and inspection of the manual in question or[,] alternatively[,] an evidentiary hearing to determine whether the manual is a trade secret"). We recognize that in camera inspections can be burdensome. *See Piña,* 2001–NMCA–055, ¶ 26, 130 N.M. 661, 29 P.3d 1062. An evidentiary hearing could result in disclosure of materials subject to evaluation. Nevertheless, we believe these options are best left to the discretion of the trial court.

{54} Similarly, the trial court may consider appointment of an expert, pursuant to Rule 11–706 NMRA, or a special discovery master, pursuant to Rule 1–053 NMRA. *See Piña,* 2001–NMCA–055, ¶ 26, 130 N.M. 661, 29 P.3d 1062. We will not set out strict guidelines for the trial court to follow because the methods used are dictated by the circumstances of a particular case and should be administered " 'to secure the just, speedy and inexpensive determination of every action.' " *Id.* ¶ 28 (quoting Rule 1–001 NMRA). Accordingly, decisions regarding the particulars of how this matter should be handled on remand shall be left to the trial court.

{55} We also recognize that Rule 11–508 does not define "trade secret," but there is direction in the definition set out in the TSA. *See, e.g., Insure N.M., LLC v. McGonigle,* 2000–NMCA–018, ¶¶ 6, 18–20, 128 N.M. 611, 995 P.2d 1053 (discussing the definition of "trade secret" under the TSA and the inquiry to be made by the trial court in determining whether a protectable trade secret exists, including whether the definition of "trade secret" was met, whether a number of factors were satisfied, and whether the trial court balanced the equities and hardships); *see also Cent. Sec. & Alarm Co. v. Mehler,* 1996–NMCA–060, ¶ 33, 121 N.M. 840, 918 P.2d 1340 (providing for financial records, asserted to be trade secrets and/or proprie-

tary commercial information, to first be produced to a certified public accountant (CPA) to determine the extent to which they were privileged or protectable and providing that the parties could serve court-approved interrogatories on the CPA). The trial court may also find it helpful to consider the six factors set out in the Restatement (First) of Torts § 757 cmt. b, at 6, and use the factors as a guide in evaluating the evidence. *See In re Bass,* 113 S.W.3d at 739–40 (holding that the six factors listed in the Restatement of Torts § 757 may be used as relevant criteria and are weighed in the context of the surrounding circumstances). While the definition in the TSA and the factors in the Restatement of Torts § 757 are not identical, both capture the essential elements of a trade secret: confidentiality and value.

{56} If the McKinsey documents are found to be trade secrets, then the burden shifts to the requesting party to show the necessity for document production. Rule 11–508 premises the assessment on whether prohibiting disclosure will "otherwise work injustice." We agree with the interpretation of this language articulated in *Bridgestone.* Mere relevance is inadequate. The party requesting production of trade secrets must make a particularized showing that the information sought is relevant and necessary to the proof of a material element of at least one cause of action presented in the case and that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit. *Bridgestone,* 9 Cal. Rptr.2d at 713. If Plaintiffs demonstrate necessity, the trial court should balance this need against potential harm to Defendant and consider appropriate protective measures.

{57} If the McKinsey documents are not found to be trade secrets, then the trial court will have to evaluate whether the documents are "other confidential research, development or commercial information," as described in Rule 1–026(C)(7), and what, if any, protection would be appropriate, depending on the evidence presented regarding good cause, as set out in *Krahling. See* 1998–NMCA–071, ¶¶ 14–17, 125 N.M. 228, 959 P.2d 562. We recognize that Plaintiffs have addressed this

possibility and that their argument would have this Court affirm the trial court's November 2001 Order, requiring disclosure. Because we have now clarified the procedure to be used when a party asserts the trade secret privilege, as opposed to the good cause standard, which is to be used when a party is seeking a protective order for other confidential research, development, or commercial information, we believe justice requires that this entire issue be returned to the trial court for resolution. *See Grant v. Cumiford,* 2005–NMCA–058, ¶ 24, 137 N.M. 485, 112 P.3d 1142 (remanding to the trial court for reexamination of the issue by using the proper test); *DeArmond v. Halliburton Energy Servs., Inc.,* 2003–NMCA–148, ¶ 23, 134 N.M. 630, 81 P.3d 573 (remanding for the trial court to consider the matter in light of the clarification regarding proof of actual knowledge).

{58} We provide one last direction. While findings are not required by rule, we would not be surprised if the trial court's decision on remand is appealed; therefore, in the interest of efficiency, we believe entry of findings based on the evidence presented would be of great help.

## III. PLAINTIFFS' ARGUMENTS

### A. Discovery Sharing

{59} In Plaintiffs' answer brief, they argue that this case is really about discovery sharing and that Defendant's resistance to disclosure of the McKinsey documents is based on the position that discovery sharing is not a legitimate use of discovery. As we explained above, the issue in this appeal relates to the status of the McKinsey documents and what, if any, protection they should be afforded. Defendant has asserted that the McKinsey documents are protectable trade secrets or confidential information, and based on the analysis set forth in this opinion, we are remanding the case to the trial court to evaluate those contentions. Once the trial court makes this determination, the issue of document sharing could arise. This issue, however, is not before us today. Therefore, discovery sharing, as discussed in *Krahling,* 1998–NMCA–071, ¶¶ 18–20, 125 N.M. 228, 959 P.2d 562, and *John Does I Through III*

*v. Roman Catholic Church of the Archdiocese of Santa Fe, Inc.,* 1996–NMCA–094, ¶ 14, 122 N.M. 307, 924 P.2d 273, is not an issue we need to address. *See John Does I Through III,* 1996–NMCA–094, ¶ 12, 122 N.M. 307, 924 P.2d 273 ("[C]ourts traditionally do not reach out to decide issues unnecessarily.").

**B.   Privilege Extinguished by Disclosure**

{60} Plaintiffs make five other arguments. The last two press affirmance and contend that the trial court properly denied Defendant's motion for protective order and thus formed the basis for entry of the default judgment against Defendant for failure to produce the McKinsey documents. We have decided these issues contrary to Plaintiffs, as we explained in section II of this opinion. We now consider Plaintiffs' remaining arguments.

{61} Plaintiffs assert that Defendant's trade secret privilege was extinguished. This contention rests on the requirement that the trade secret privilege be based on a showing of document secrecy; according to Plaintiffs, all secrecy in the McKinsey documents was lost when the protection provided by the Interim Protective Order expired by its own terms fourteen days after the writ was denied in our first opinion in this case. We agree that the protection provided by the Interim Protective Order expired by its own terms, but disclosure did not automatically occur. On the contrary, Defendant refused to produce the documents without protection, and that refusal ultimately resulted in the entry of a default judgment. Defendant's claim of privilege was not extinguished by the expiration of the Interim Protective Order.

**C.   Waiver**

{62} In their next argument, Plaintiffs contend that Defendant waived the trade secret privilege by failing "to affirmatively demonstrate an 'objectively reasonable basis' for each assertion of privilege" in its original discovery responses. Citing to *Piña,* Plaintiffs also argue that Defendant was required to provide a privilege log or affidavits in support of the privilege claim at the time the

response was filed. There are two parts to this argument.

{63} First, Plaintiffs read *Piña* to require that a privilege log be submitted in any case. While we agree that *Piña* contains language directing the use of this procedure, we also observe that this Court recognized the unique nature of privilege claims and that each case should be governed by its own circumstances. We qualified our direction as follows: "The above guidelines are not immutable. They may be modified as required by the circumstances of a particular case and, as always, should be administered 'to secure the just, speedy and inexpensive determination of every action.' " *Piña,* 2001–NMCA–055, ¶ 28, 130 N.M. 661, 29 P.3d 1062 (quoting Rule 1–001). We encourage the parties, subject to court approval, to stipulate to simplified or streamlined procedures for resolving privilege claims.

{64} We look to the circumstances of this case. Defendant, in its discovery response, objected on the basis that the requested documents were "confidential or proprietary information." Although Defendant did not specifically state "trade secret privilege," Plaintiffs immediately recognized that Defendant was asserting that the McKinsey documents were trade secrets. Under the heading titled "Trade Secrecy" in Plaintiffs' memorandum in support of the motion to compel, they specifically addressed Defendant's trade secret claim. Defendant responded to the motion to compel with case law and factual assertions supported by the Sullivan affidavit. The arguments made at the hearing on October 30, 2001, were premised on the understanding that Defendant was asserting the trade secret privilege. Further, this argument was addressed by the trial court, which recognized that while Defendant did not use the term "trade secret" in the response, the court assumed Defendant was asserting a trade secret and evaluated the claim on that basis. Thus, it appears the trial court was not persuaded that the privilege had been waived. There was no gradual unveiling of the basis for the privilege, a practice expressly disapproved of in *Piña.* 2001–NMCA–055, ¶ 25, 130 N.M. 661,

29 P.3d 1062. Based on the above, we see no waiver of the trade secret privilege.

{65} Second, in a related argument, Plaintiffs claim that all information in support of the privilege should be filed by the date the response is due. Plaintiffs contend that Defendant waived the privilege by not filing the motion for protective order containing an evidentiary showing of good cause on or before the date Defendant's discovery responses were due and, in any event, by not filing the motion for protective order until after Plaintiffs filed their motion to compel. We reject this argument because we have established a new framework for cases involving the assertion of trade secret privilege, which does not require the party asserting the privilege to establish good cause. We decline Plaintiffs' invitation to elevate form over substance; our remand to the trial court provides a fresh opportunity to the parties to implement the new framework we announce in this opinion.

## IV. DISSENT

{66} The dissent is based on two main grounds: its perception that the majority fails to recognize the contingent nature of a trade secret privilege and its conclusion that the majority holding eliminates the good cause requirement of Rule 1–026(C)(7) in evaluating trade secret discovery. Dissenting Opinion, ¶ 74. We address these points in turn.

{67} The conditional nature of the trade secret privilege as set forth in Rule 11–508 is discussed at length in this majority opinion. In paragraph 50 we explain the process. First, the resisting party, Defendant in this case, must establish that the material requested under the discovery rules is a trade secret. The definitions of trade secret are set out in paragraphs 30–32, and general guidance regarding assessment of the relevant criteria in the context of surrounding circumstances is found at paragraph 55. In order to establish the existence of a trade secret, the resisting party must establish an element of harm. If the resisting party establishes that the discovery requested is a trade secret, there is no automatic bar to discovery. Instead, the inquiry continues.

As we explain in paragraphs 50 and 56, the requesting party must show the necessity for document production, and then the trial court evaluates the need for the information and the potential harm of disclosure to the resisting party. Based on weighing these factors, the trial court determines if, to what extent, and how disclosure must be made. Protection is not automatic, but rather is dependent on the trial court's evaluation of the particular facts related to assertion of the privilege.

{68} As to the second basis, we disagree that a party resisting discovery of a trade secret is required to meet the "good cause" standard set out in Rule 1–026(C)(7) as interpreted by *Krahling*. We also disagree with the dissent's premise that Defendant knew and understood that this "good cause" standard needed to be met to protect a trade secret. Dissenting Opinion, ¶ 87. At the hearing on October 30, 2001, Defendant argued that its burden was to establish that the documents were trade secrets. In the alternative, Defendant argued that if the documents were not found to be trade secrets, then Defendant would have to meet the "good cause" standard under *Krahling* and that it had met that burden with the Sullivan affidavit. We do not understand this argument to concede that the "good cause" standard under *Krahling* must be met in order to invoke the trade secret privilege.

{69} The difference between the majority position and that of the dissent relates to how the burden is to be allocated and what standard is to be used. According to the dissent, once the requesting party seeks discovery, and the resisting party has asserted the trade secret privilege, the resisting party would have to meet two burdens. It would have the burden of establishing the existence of a trade secret and then the further burden of demonstrating that there is "good cause" to protect the disclosure of that trade secret as set forth in *Krahling*. Failure to prove both would result in unprotected disclosure.

{70} We disagree with the requirement of meeting the double burden. As we set forth previously, the resisting party has the initial burden of establishing that the material in question is a trade secret. If this burden is not met, there is no further inquiry under

Rule 11–508, and the general provisions of Rule 1–026(C)(7) would govern. If the resisting party meets this burden, then the burden shifts to the requesting party to show necessity; and if necessity is shown, the trial court weighs the need for the information against the potential harm of disclosure to the resisting party and makes its determination regarding disclosure. As we detail in paragraphs 47–48, by proving the existence of a trade secret, the resisting party necessarily addresses the issue of harm. In effect, the dissent would not have the trial court do any weighing unless the resisting party proved that a "clearly defined and serious injury" would result if disclosure were ordered. This is the standard that must be met when protection is requested for confidential material that is not privileged. Once a trade secret becomes the subject of discovery, however, we believe a different process is used. It is up to the trial court to weigh the harm to the resisting party against the need for disclosure and fashion an order based on the facts of a particular case. The dissent's approach would limit the trial court's discretion and essentially eliminate any separate privileged status provided by the Rule 11–508.

{71} We agree with the dissent that the rules of civil procedure and rules of evidence must be read so that they are compatible and complementary. We believe that our reading does just this, given the interplay between Rule 1–026(C)(7) and the privileged status given to trade secrets under Rule 11–508. We also observe that in its court order dated April 26, 1973, adopting the rules of evidence, our Supreme Court ordered that "the Rules of Evidence supersede the Rules of Civil Procedure insofar as they may be in conflict with these rules." This leads us to conclude that to the extent there is any conflict between Rule 1–026(C)(7) and Rule 11–508, the provisions of Rule 11–508 would control.

## V. CONCLUSION

{72} Based on the above, we cannot agree with the approach offered by the dissent. We reverse the orders of the trial court requiring unprotected disclosure of the McKinsey documents. As a result of this reversal, we remand this case to the trial court with instructions first, to vacate the default judgment entered on July 8, 2004, and second, to reevaluate Defendant's assertion of the trade secret privilege as to the McKinsey documents in a manner consistent with this opinion.

{73} **IT IS SO ORDERED.**

I CONCUR: CYNTHIA A. FRY, Judge.

MICHAEL E. VIGIL, Judge (dissenting).

VIGIL, Judge (dissenting).

{74} I dissent from the majority opinion for two reasons: (1) it fails to recognize the contingent nature of a trade secret privilege under our Rules of Evidence; and (2) it mistakenly construes Rule 11–508 of the Rules of Evidence to eliminate the good cause requirement of Rule 1–026(C)(7) of the Rules of Civil Procedure for imposing a protective order in the discovery of trade secrets. Rule 11–508 of the Rules of Evidence and Rule 1–026(C)(7) of the Rules of Civil Procedure are not mutually exclusive as suggested by the majority; they are compatible and complementary.

{75} I agree with the majority that the person asserting a trade secret privilege not to provide discovery has the burden of establishing the privilege. Majority Opinion ¶¶ 39, 41. However, I reject the suggestion made by the majority that it makes any difference whether the burden arises in the context of a motion for protective order or a motion to compel. Majority Opinion ¶ 37. The elements of a trade secret privilege are the same whether within the context of a motion to compel discovery under Rule 1–037(A) or a motion for a protective order under Rule 1–026(C)(7). It happens that in this case the issue arises in the context of Plaintiffs' motion to compel discovery. It was therefore Defendant's burden to establish that it had a trade secret privilege not to disclose the McKinsey documents in response to Plaintiffs' Request for Production No. 5.

**The Trade Secret Privilege**

{76} Rule 11–508 of the Rules of Evidence is entitled "Trade Secrets" and provides:

A person has a privilege, which may be claimed by the person or the person's agent or employee, to refuse to disclose and to prevent others from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. When disclosure is directed, the court shall take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require.

{77} The Rule does not define what constitutes a privileged trade secret. Two broad formulas have emerged for determining what constitutes a trade secret. The first was originally promulgated in 1939 by the Restatement (First) of Torts § 757, which addressed general principles of liability for disclosing or using another's trade secret. In adopting the Restatement, the American Law Institute acknowledged, "an exact definition of a trade secret is not possible." Restatement § 757, cmt. b. Instead of attempting to provide a comprehensive definition, it identified factors to be considered in determining the existence of a trade secret:

Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.*

{78} Section 757 of the Restatement (First) of Torts was omitted from the Restatement (Second) of Torts and incorporated into the Restatement (Third) of Unfair Competition. *See generally In re Bass*, 113 S.W.3d at 739. However, the six factors from Section 757 are still considered. *See* Restatement (Third) of Unfair Competition § 39 reporter's n. cmt. d (1995) ("In determining the existence of a trade secret, many cases rely on the factors identified in Restatement of Torts § 757 cmt. b").

{79} Under the Restatement formulation, the six factors are not to be considered in a systematic or mechanical manner for determining whether a trade secret exists because by their very nature, the factors are imprecise. *See In re Bass*, 113 S.W.3d at 739 (stating that the factors are to be treated as relevant, but not dispositive, criteria because it is not possible to state precise criteria for determining the existence of a trade secret and that the status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors); *Crum v. Bridgestone/Firestone N. Am. Tire*, 2006 PA Super. 230, ¶ 19, 907 A.2d 578 (stating that in weighing the six factors, the crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner).

{80} The second broad formula for determining the existence of a trade secret is contained in the Uniform Trade Secrets Act which was approved and recommended for enactment by the National Conference of Commissioners on Uniform State Laws in 1979. This Act was adopted in New Mexico in 1989, and is codified at Sections 57–3A–1 to –7. Under the Act, a "trade secret":

[M]eans information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) derives independent and economic value, actual or potential, from not being generally known to and not be readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Section 57–3A–2(D).

{81} This statutory definition also requires its various elements to be considered and weighed. *See Mediacom Iowa, L.L.C. v. Inc.*

*City of Spencer*, 682 N.W.2d 62, 67 (Iowa 2004) (stating that whether the definition of a trade secret is satisfied under the Uniform Trade Secrets Act is a mixed question of law and fact; that the legal determination is whether the material sought is "information"; and the factual determination is whether the factors described in subsections (1) and (2) are satisfied); *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427, 971 P.2d 936, 941 (1999) (en banc) (stating that while the definition of a trade secret is a matter of law under the Uniform Trade Secrets Act, whether specific information in a given case is a trade secret is a factual question). *See also Star Scientific, Inc. v. Carter*, 204 F.R.D. 410, 414 (S.D.Ind.2001) (noting that the Indiana Uniform Trade Secret Act is identical to the Uniform Trade Secrets Act and that in Indiana a trade secret has four characteristics: "(1) information; (2) which derives independent economic value; (3) is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (4) the subject of efforts reasonable under the circumstances to maintain its secrecy.") (quoting *Ackerman v. Kimball Int'l, Inc.*, 634 N.E.2d 778, 783 (Ind.Ct.App.1994), *vacated in part, adopted in part*, 652 N.E.2d 507 (Ind.1995)).

{82} The quintessential elements of a trade secret under either formulation are: (1) that the owner undertakes to keep the information secret; (2) that the information has a competitive or financial value to its owner; and (3) that its unauthorized disclosure will result in damage or harm to its owner. *See Crum*, 2006 Pa.Super. 230, ¶ 19, 907 A.2d 578.

{83} However, even if a person establishes ownership of a trade secret, the trade secret may not be recognized as a privileged trade secret under Rule 11–508. "[T]here is no absolute privilege for trade secrets and similar confidential information." *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 362, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979) (internal quotation marks and citation omitted). Rule 11–508 gives textual recognition to this principle. Unlike other privileges, a trade secret is accorded privileged status under Rule 11–

508 only "if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice." *Id.* When non-disclosure of a trade secret will result in injustice, there is no privilege. Thus, Rule 11–508 only grants a conditional privilege to trade secrets. *See Mediacom Iowa, L.L.C.*, 682 N.W.2d at 66 (stating there is "no true privilege against discovery of trade secrets"); *Medical Arts Clinic, P.C. v. Franciscan Initiatives, Inc.*, 531 N.W.2d 289, 299 (N.D.1995) (construing similarly worded North Dakota rule and stating that the trade secret rule provides for a "limited privilege"; that the instances in which invocation of the privilege is justified are few; and that the rule provides for only a conditional privilege).

{84} The foregoing analysis is applicable to determine in the first instance whether the person asserting a trade secret has established ownership of a privileged trade secret under Rule 11–508. The person making the claim must come forward with evidence relating to the six Restatement factors and the statutory factors of Section 57–3A–2(D) to substantiate his assertion that he owns a trade secret. The trial court must then evaluate and weigh the evidence in context to determine whether a prima facie showing has been made to ownership of a trade secret. Of necessity, this determination must be left to the discretion of the trial court. If the trial court concludes that the claimant has failed to establish that the information is a trade secret, the inquiry ends. However, if the trial court concludes that a trade secret has been established, the trial court must still determine whether allowing a privilege to attach to the information will result in injustice. Again, this evaluation of all the relevant factors presented requires the trial court to exercise its discretion. Only if the trial court also concludes that allowing a privilege to attach to the information will not result in an injustice, is the information afforded privileged trade secret status under Rule 11–508.

{85} Finally, even when the trial court determines in its discretion that a privileged trade secret exists, the trial court may still order that it be disclosed. The final sentence of Rule 11–508 provides, "When disclosure is

directed, the court shall take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require." I understand this provision of the rule to allow the trial court in its discretion to order disclosure of a trade secret *notwithstanding* its determination that the holder has a bona fide trade secret. The exercise of that discretion is guided by three factors: (1) the interests of the holder of the privilege; (2) the interests of the parties to the litigation before the court; and (3) the furtherance of justice. Thus, the trade secret privilege may, in appropriate circumstances, yield to other competing public policy values, such as requiring the courts to operate in the open and not behind a shroud of secrecy, and the right of litigants to full discovery and the subsequent full use of that discovery at trial. *See Estate of Romero*, 2006–NMSC–028, ¶ 7, 139 N.M. 671, 137 P.3d 611 (stating that a person is generally required to disclose any information he may possess that is relevant to a case pending before a court); *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir.1984) ("[P]ublic access to civil trials enhances the quality and safeguards the integrity of the factfinding process, fosters an appearance of fairness, and heightens public respect for the judicial process[.]") (internal quotation marks and citations omitted); *Bryan v. Eichenwald*, 191 F.R.D. 650, 652 (D.Kan.2000) ("[T]he public has an interest in everything that occurs in [a] case, whether at trial or during the discovery stage of litigation.").

{86} To support its assertion that the McKinsey documents contain privileged trade secret information, Defendant submitted the affidavit of Christine Sullivan. Because of its importance to the issues in this case, a copy of the affidavit is attached as an appendix to this dissent. The trial court did not deny Defendant's motion for a protective order because the documents did not contain trade secret information; it denied the motion on the basis that Defendant failed to establish good cause. I therefore assume that the Christine Sullivan affidavit established the necessary requisites to satisfy the trial court that the McKinsey documents contain privileged trade secret information, and

consider whether Defendant demonstrated good cause for a protective order.

## Good Cause to Justify a Protective Order

{87} Plaintiffs filed a motion to compel production of the McKinsey documents, and argued in part: "[I]n order to sustain its trade secrecy objection, Allstate has the burden to show that disclosure of the pertinent documents would cause a *specific*, significant harm to its competitive and financial position." (citing *Deford v. Schmid Prod. Co.*, 120 F.R.D. 648 (D.Md.1987)). *Deford* states:

> Where a business is the party seeking protection, it will have to show that disclosure would cause significant harm to its competitive and financial position. That showing requires specific demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm.

*Id.* at 653. In making the foregoing statement, *Deford* specifically relies upon the "good cause" requirement of Rule 26(c) of the Federal Rules of Civil Procedure to impose a protective order for "a trade secret or other confidential research, development, or commercial information" under Rule 26(c)(7) of the Federal Rules of Civil Procedure. *Deford*, 120 F.R.D. at 652–53. In response to Plaintiffs' motion, Defendant argued, "Because [the McKinsey documents] are trade secrets, the requested documents should not be required to be produced. If this Court *does* require their production, they should be produced only subject to a confidentiality order, requiring that the documents be kept confidential, be used only for this litigation, and returned at the conclusion of this case." Defendant then specifically referred to Rule 1–026(C)(7) in support of its argument. Rule 1–026(C)(7) states that "for good cause shown," the trial court may make an order "that a trade secret . . . not be revealed or be revealed only in a designated way." Thus, whether by reference to Plaintiffs' arguments or its own response, Defendant knew and understood that "good cause" was required to justify imposition of a protective order.

{88} The structure of the New Mexico Rules of Civil Procedure require a finding of "good cause." Rule 1–037 NMRA provides that a party may apply to the trial court for an order compelling discovery. This is what Plaintiffs did by asking the trial court to order Defendant to produce the McKinsey documents. Defendant responded that the motion should be denied because the McKinsey documents contain trade secrets, but if production was ordered, it should be under a protective order. Defendant therefore invoked Rule 1–037(A)(2) and Rule 1–026(C)(7). Rule 1–037(A)(2) provides that when the trial court denies a motion for an order compelling discovery in whole or in part, as requested by Defendant, "it may make such protective order as it would have been empowered to make on a motion made pursuant to Rule 1–026." Rule 1–026(C)(7) in turn provides, "Upon motion by a party or by the person from whom discovery is sought, *and for good cause shown*, the court ... may make any order which justice requires ... including ... that a trade secret or other confidential research, development or commercial information not be revealed or be revealed only in a designated way." (Emphasis added.)

{89} Existing precedent defines the meaning of "good cause" in this context. In *Krahling*, the trial court ordered Honeywell to provide discovery but granted its request that the information be kept confidential. 1998–NMCA–071, ¶ 4, 125 N.M. 228, 959 P.2d 562. Honeywell was allowed to designate all of the documents it produced in discovery as "confidential" without any showing of a basis for the designation. *Id.* ¶ 5. After summary judgment was granted in favor of the party receiving the discovery, it filed a motion to lift the confidentiality order, arguing that because Honeywell did not make a prima facie showing of good cause in support of the confidentiality order, the burden of proof remained upon Honeywell to support continuation of the protective order. *Id.* ¶ 14. We agreed. *Id.* Referring to Rule 1–026(C), we said, "An order prohibiting the disclosure of information obtained during discovery proceedings must be supported by a finding of good cause." *Krahling*, 1998–NMCA–071, ¶ 15, 125 N.M. 228, 959 P.2d 562. We then stated:

Good cause is established [by] showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity.... In determining whether a party has made a showing of good cause for the issuance of a protective order, courts have generally applied a balancing process.

*Id.* (internal quotation marks and citations omitted).

{90} In the hearing before the trial court, Plaintiffs argued that the Christine Sullivan affidavit filed by Defendant failed to demonstrate just cause to justify a protective order because it failed to show how a clearly defined serious injury would result if the McKinsey documents were disclosed without a protective order as required by *Krahling*. In response, Defendant argued, "The burden is to establish a trade secret as that is defined under New Mexico law and if that trade secret is established, then this Court must take such appropriate measures as will protect that trade secret because it is privileged under New Mexico law." Defendant asserted that just cause to impose a protective order is satisfied by simply demonstrating that the McKinsey documents contain trade secrets, and that the Christine Sullivan affidavit satisfied this burden: "We are not saying that burden isn't upon us, we believe that is a burden we have of establishing good cause to believe this information is [a] trade secret. And that is what we have done with the Christine Sullivan affidavit." In response to Defendant's additional argument that Plaintiffs were asserting a standard of good cause which had not been previously recognized under New Mexico law, the trial court said:

I am looking at *Krahling*. [G]ood cause is established by showing the disclosure will work a clearly defined and serious injury to the parties seeking closure. The injury must be shown with specificity. That looks pretty clear cut to me. It's not like a new standard which I would be adopting.

Defendant then asserted that the Christine Sullivan affidavit satisfied *Krahling* because it demonstrated that the information was

created at a significant expense, competitors wanted the information, and if it were made publicly available, Defendant would suffer a competitive disadvantage. At the conclusion of the hearing, the trial court announced: "I rely upon the *Krahling* case which I believe sets forth the appropriate standard for defending disclosure in the face of challenges based on claims of confidentiality.... [S]o I find that the declaration of [Christine] Sullivan which is the basis for [Defendant's] claim is simply too general and conclusory to support [its] request for [a] protect[ive] order or protection from disclosure."

{91} The formal order compelling production of the McKinsey documents without a protective order incorporates the trial court's reasoning. In pertinent part the order states:

> [Defendant] has resisted production of these documents upon the grounds of trade secret confidentiality and has requested that a protective order be entered based on the Affidavit of Christine Sullivan filed in support of [Defendant's] assertion of trade secret confidentiality; that the Affidavit of Christine Sullivan is too general and conclusory to support a protective order restricting production or dissemination of the [McKinsey documents] under the good cause standard for protective orders established in *Krahling*.

Defendant was therefore ordered to produce the McKinsey documents, and Defendant's "request for a protective order restricting disclosure of the documents ordered produced herein be, and the same is hereby, denied."

{92} Defendant's response and Rule 1–026(C)(7) required the trial court to consider whether Defendant demonstrated "good cause" to justify imposing a protective order relating to its production of the McKinsey documents. However, the majority states that Defendant was not required to demonstrate "good cause" because Rule 11–508 has no "good cause" requirement. Majority Opinion ¶ 44. This conclusion requires the words "good cause shown" to be deleted from Rule 1–026(C)(7) as it relates to trade secrets. I do not believe this is permissible or necessary. We are required to apply the Rules of Civil Procedure and the Rules of Evidence as adopted by the Supreme Court. *Alexander v. Delgado*, 84 N.M. 717, 718, 507 P.2d 778, 779 (1973). In applying these rules which cover the same subject matter of trade secrets, we are to avoid conflict or inconsistency, and apply them in a harmonious and complementary manner. *See State v. Smith*, 2004–NMSC–032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 (stating that we are to read different legislative enactments as harmonious instead of contradicting each other); *State ex rel. Quintana v. Schnedar*, 115 N.M. 573, 575–76, 855 P.2d 562, 564–65 (1993) (directing that two statutes covering the same subject matter should be harmonized and construed together, when possible, in a way that facilitates their operation and the achievement of their goals).

{93} I also disagree with the majority's conclusion that requiring the holder of the privilege to establish just cause for a protective order renders the language of Rule 11–508 and the privilege itself "meaningless." Majority Opinion ¶¶ 45–49. As already discussed, before a trial court directs that a trade secret is to be disclosed under Rule 11–508, it must take into account (1) the interests of the holder of the privilege; (2) the interests of the parties; and (3) the furtherance of justice in fashioning an appropriate protective measure. This obviously requires the sound exercise of discretion in light of the specific circumstances that are before the court. Requiring the holder of the privilege to show "good cause" as required by Rule 1–026(C)(7) is not inconsistent with balancing these interests. In light of the nature of a trade secret, and the almost infinite variety of permutations that a trade secret can assume, it is essential that a trial court be presented with the necessary information so it can determine whether to order disclosure of a trade secret with or without a protective order. *See Crum*, 2006 Pa.Super. 230, ¶ 20, 907 A.2d 578 (construing the Pennsylvania counterpart to Rule 1–026(C)(7): "The questions of whether disclosure is to be allowed, if protection is to be afforded, and the form of such protection, are matters to be determined according to the discretion of the [trial] court.").

{94} The majority itself recognizes that even if the existence of a trade secret is established, the information may be so minimal that there is no danger it could be used by another to obtain economic value in competition with the owner. Majority Opinion ¶ 38. Since a trade secret is by its nature secret, only the holder can show the trial court whether, and to what extent, disclosure will cause the holder damage. Further, the holder of the privilege appropriately shoulders the burden of demonstrating what specific damage may result, so that a protective order that shields the holder against that damage can be fashioned, if one is appropriate. *See Mediacom Iowa, L.L.C.*, 682 N.W.2d at 68 (stating that to determine whether there is good cause to impose a protective order for trade secrets, there must be a showing that the harm posed by dissemination of the information is substantial and serious); *In re Cont'l Gen. Tire*, 979 S.W.2d at 612 (noting that federal courts and the courts in California and Florida require the party resisting discovery to establish that disclosure of the trade secret would be harmful). When these elements are satisfied, the trial court can fashion an appropriate manner in which the information is to be disclosed, while advancing the interests of justice and protecting the rights of the litigants before it to have information they require. This is what I understand the burden of showing "good cause" means in *Krahling*. The same approach has been required by our Supreme Court when privileges not set forth in the Rules of Evidence have been invoked. *See Estate of Romero*, 2006–NMSC–028, ¶¶ 19, 21, 139 N.M. 671, 137 P.3d 611 (directing that in order to determine if the Inspection of Public Records Act precludes discovery of law enforcement investigation documents, the party seeking to preclude disclosure has the burden of proving the information is confidential; and if disclosure is ordered, a protective order under Rule 1–026(C) may be considered); *Sw. Cmty. Health Servs. v. Smith*, 107 N.M. 196, 200–01, 755 P.2d 40, 44–45 (1988) (concluding that the party objecting to discovery of peer review organization records has the burden of establishing that it is confidential under NMSA 1978, § 41–9–5 (1979), and thereafter entrusting the trial court with balancing the need to ensure the confidentiality of peer review against the need of litigants to discover evidence essential to their case, which may nevertheless compel production of the evidence); *State ex rel. Attorney Gen. v. First Jud. Dist. Ct.*, 96 N.M. 254, 258, 629 P.2d 330, 334 (1981) (concluding that when the claim of executive privilege is made as to information requested in discovery, the trial court must first determine whether it has been properly invoked, and then it must balance the public interest in preserving confidentiality to promote intra-governmental candor with the individual's need for disclosure of the particular information sought).

{95} On the merits, the affidavit of Christine Sullivan tendered by Defendant *at best* only established that the McKinsey documents contain trade secret information. However, Defendant failed to establish that the documents contain *privileged* trade secret information, because the affidavit failed to establish that allowing the privilege would not result in an injustice in this case. Furthermore, even if the affidavit can be construed as satisfying all the elements of a privileged trade secret, Defendant failed to satisfy its burden of showing "good cause" as required by *Krahling* to require the trial court to exercise its discretion to determine whether a protective order was necessary in the first place, and if so, what protective measures might be appropriate. Specifically, Defendant failed to show what the "serious" and "clearly defined" injury would be if the McKinsey documents were disclosed without a properly tailored protective order. The trial court has broad discretion in determining whether good cause exists to issue a protective order. *John Does I through III*, 1996–NMCA–094, ¶ 13, 122 N.M. 307, 924 P.2d 273. Furthermore, "we do not tell the trial court when it is appropriate to issue protective orders under [Rule 1–026] to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense." *Estate of Romero*, 2006–NMSC–028, ¶ 21, 139 N.M. 671, 137 P.3d 611 (quoting *State ex rel. Attorney Gen.*, 96 N.M. at 261, 629 P.2d at 337). I therefore conclude that no abuse of discretion was committed in ordering that the McKinsey documents be

produced in discovery without a protective order.

### The Default Judgment Sanction

{96} Defendant recognized it had an obligation to demonstrate good cause before it was entitled to produce the McKinsey documents under a protective order. Furthermore, well settled, existing New Mexico precedent defined what was required to demonstrate good cause. Notwithstanding its clear understanding and what was plainly required, Defendant failed to establish the requisite good cause.

{97} Since November 13, 2001, Defendant has been ordered to produce the documents without protection. The documents still have not been produced without protection. On June 4, 2004, Defendant was told that if it refused to produce an unprotected set of the McKinsey documents, a default judgment, on liability would be entered. Defendant refused, and the default judgment was filed. In the default judgment, the trial court found that by knowingly refusing to produce the McKinsey documents as ordered, Defendant "has intentionally disobeyed this Court's Order of June 4, 2004, as well as this Court's Orders of November 13, 2001, December 18, 2001, and January 7, 2002[.]" Defendant does not challenge this finding, and it is undisputed that Defendant willfully violated the trial court order compelling discovery.

{98} We review sanctions for discovery violations under an abuse of discretion standard, and while a default judgment is, to be sure, a severe sanction, when a discovery obligation is wilfully violated, a default judgment is within the proper parameters of discretion. *Allred v. Bd. of Regents of Univ. of N.M.*, 1997–NMCA–070, ¶¶ 17, 20–28, 123 N.M. 545, 943 P.2d 579 (collecting and analyzing cases). When the discovery violation is conscious or intentional, it is a willful violation, and no wrongful intent needs to be shown. *Id.* ¶ 20. Thus, Defendant's assertion that it consciously, intentionally, and thereby willfully violated the trial court order in order to challenge the discovery order in this appeal does not insulate Defendant from a default judgment. *Id.* ¶¶ 31–32.

{99} I do not agree with the majority that Defendant is entitled to yet another chance to demonstrate good cause to produce the McKinsey documents under a protective order. I am also not persuaded that the trial court abused its discretion by granting a default judgment when Defendant willfully refused to comply with its discovery obligations in this case.

{100} For all the foregoing reasons, I dissent.

### Appendix 1

FIRST JUDICIAL DISTRICT COURT

COUNTY OF SANTA FE

STATE OF NEW MEXICO

No. D–0101–CV–2000–2894

JOSE PINCHEIRA, OLIVIA PINCHEIRA, RUDY VIGIL, MARIA ELISA VIGIL, and AMY MARQUEZ, Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY, TOM YOUNT, DAVE YOUNT, and SYLVIA ENCINIAS, Defendants.

### AFFIDAVIT OF CHRISTINE SULLIVAN

I, CHRISTINE SULLIVAN, of lawful age and being first duly sworn upon my oath, depose and state the following:

1. My name is Christine Sullivan. I am an employee of Allstate Insurance Company. My position is Assistant Vice President in the Property–Casualty Claim Service Organization at Allstate Insurance Company's home office in Northbrook, Illinois. I have been an Allstate employee for 28 years and have personal knowledge regarding the statements in this Affidavit.

2. Allstate retained McKinsey & Company to work with Allstate personnel to conduct a top to bottom review of its claim handling practices and procedures. As part of that review, closed claim files were reviewed in many markets, surveys were conducted and other investigation was performed in an effort to improve and bring uniformity to Allstate's claim handling processes and procedures, and address historical overpayment of claims. Once the review was completed, All-

state and McKinsey redesigned certain claim handling processes and procedures that were then implemented and tested in certain markets. Beginning in 1995, these redesigned claims handling processes and procedures were implemented nationwide in a program called Claim Core Process Redesign ("CCPR"), and Allstate's employees responsible for handling claims and the management and supervision of claims received training in those processes and procedures.

3. The CCPR program and materials, including the documents created by McKinsey & Company personnel during their review of Allstate's claims handling processes, and the resulting claims practices and procedures were developed at a considerable investment of time, manpower and financial resources on the part of Allstate.

4. Allstate's CCPR implementation manual, as well as Allstate's claim manuals, guidelines, management reports, and other records relating to McKinsey & Company's work for Allstate are confidential, proprietary, and trade secrets and are treated as such by Allstate.

5. Allowing access to Allstate's confidential training materials, management reports, statistics, and McKinsey & Company documents will give Allstate's competitors the unfair advantage of obtaining, at no cost, Allstate's valuable business techniques, programs, processes and information that were developed as a result of Allstate's significant investment of time, manpower and financial resources, thereby diluting the effectiveness of Allstate's investment and causing irreparable harm to Allstate's competitive position.

6. Allstate believes its procedures for investigating, handling, adjusting, and evaluating casualty claims give Allstate an advantage in attracting and keeping policyholders which competitors do not share.

7. Allstate has taken reasonable and appropriate precautions to maintain the confidentiality of these records and protect its trade secrets.

8. Allstate has made significant efforts to preserve the secrecy of its claim manuals and related materials. For example, Allstate maintains its claim manuals and related materials as confidential and limits access to these materials to employees and other persons who are under an obligation to keep these materials confidential. The employees and others who have access to these materials are specifically advised that these are confidential materials provided to them with the express or implied understanding that these confidential materials will not be revealed to any third parties. Access to management reports, statistical information and the like is limited to certain management personnel.

9. Notices are printed on the claim manuals referring to the confidential nature of the materials and the prohibition against disclosure to third parties. In many instances, a statement is included in large type on the title page indicating that the materials are "Confidential" and are the property of Allstate and are not intended for distribution to third parties.

10. Allstate keeps these materials in secured locations. Allstate's offices, in general, are locked when they are not open for business and access into Allstate's offices is controlled during business hours. Allstate's Real Estate and Construction Department maintains a set of standard construction specifications for company offices that requires security controls to protect against unauthorized persons entering nonpublic areas of Allstate's premises. Allstate's claim manuals and related materials are physically located in interior offices that require electrical, mechanical, or some other form of controlled access.

11. Allstate management reports, statistical information and the like are kept on computer and all authorized code is required to access the data. Access to the data is recorded on the computer. Print outs of this data are kept in the secured offices referenced above.

12. Allstate has not authorized or given permission to anyone to make copies of or distribute any of the claim manuals, management reports, and McKinsey & Company documents, and related materials. Allstate has not offered any of this information for sale, nor has Allstate made any of it available

for public use. Any distribution of this information has been undertaken in disregard of Allstate's rights to control distribution. of its materials and Allstate is pursuing efforts to curtail the disclosure and/or distribution of these documents.

13. Allstate has resisted the unfettered production and distribution of these materials in other litigation and has always requested, and generally received, confidentiality orders for any such records produced.

14. Allstate's employees expressly agree and/or are expressly required to keep such materials confidential and to not produce such materials to third parties.

15. Allstate's Special Investigation Unit ("Sill") policies and procedures are designed to prevent, or at least deter, suspected fraud. Revelation of Allstate's Sill practices and procedures will harm this effort, perhaps significantly.

16. Allstate's Claim Core Process Redesign is a program of internal policies, methods, and procedures developed by Allstate for handling claims.

17. Allstate does not disseminate information about the Claim Core Process Redesign to the general public or competitors in the insurance industry.

18. Allstate employees are required to maintain confidentiality about the Claim Core Process Redesign. Only a limited number of high-level Allstate employees have access to McKinsey & Company documents, on a need-to-know basis.

19. The Claim Core Process Redesign is valuable, in part, because it is information that is not generally known.

20. The CCPR claims manual contains information considered confidential and proprietary to Allstate concerning the process of adjusting claims. Allstate believes these procedures give it a competitive edge with respect to procedures used by other insurance companies with which it competes, and provides a significant benefit to its shareholders and policyholders. This benefit, and the investment that created it, would be lost if these materials were obtained or disclosed to its competitors.

21. Allstate does not maintain information compiled in defending litigation in one location. Specifically, Allstate maintains no central repository, in which it places information pertaining to expert witnesses hired by opposing parties, like, for example, Gary T. Fye and Linda Brown. In order to obtain prior testimony provided by Mr. Fye and Ms. Brown in litigation against Allstate, it would be necessary to canvass outside counsel retained by Allstate throughout the country, to determine where such materials could be found. This would be a time-consuming and burdensome process.

FURTHER AFFIANT SAYETH NOT.

CHRISTINE SULLIVAN

STATE OF ILLINOIS)
           ) ss.
COUNTY OF COOK)

The foregoing instrument was subscribed, sworn to and acknowledged before me this /8ᵗʰ day of September 2001, by CHRISTINE SULLIVAN.

Notary Public

My commission expires:

11/18/02

W0185756.DOC

OFFICIAL SEAL
RICHARD J VAVRA
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP NOV 18,2002