The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: May 15, 2025

**NO. S-1-SC-39966**

**FRANCISCO RAMIREZ,**
**JACQUELINE REYES-MENDOZA,**
**AND THEIR MINOR CHILD B.R.,**

     Petitioners,

v.

**HON. DAYLENE A. MARSH,**
**District Court Judge,**
**Eleventh Judicial District Court,**

     Respondent,

and

**DAVID PAULINO PADILLA-SUAZO,**

     Real Party in Interest.

**ORIGINAL PROCEEDING**

New Mexico Victims' Rights Project
Carolyn Callaway
Albuquerque, NM

for Petitioners

Raúl Torrez, Attorney General
Mark W. Allen, Assistant Attorney General
Jeff D. Herrera, Assistant Attorney General
Van Snow, Acting Deputy Solicitor General
Santa Fe, NM

Administrative Office of the District Attorneys
Robert P. Tedrow, District Attorney
Theresa E. Walker, Deputy District Attorney
Farmington, NM

for Respondent

Burns Law Group, P.C.
Mitchel S. Burns
Farmington, NM

for Real Party in Interest

Martinez, Hart, Sanchez & Romero, P.C.
Julio C. Romero
Kelly Stout Sanchez
F. Michael Hart
Albuquerque, NM

for Amicus Curiae National Crime Victim Law Institute

Saiz, Chanez, Sherrell & Kaemper, P.C.
Denise M. Chanez
Albuquerque, NM

Skadden, Arps, Slate, Meagher & Flom, LLP
Gregory P. Ranzini
Wilmington, DE

for Amici Curiae National Immigrant Women's Advocacy Project, Inc., & Victim Rights Law Center

**CONSOLIDATED WITH**
**NO. S-1-SC-40114**

**NEW MEXICO IMMIGRANT LAW**
**CENTER,**

Petitioner,

v.

**THE HON. CINDY LEOS,**
**District Court Judge,**
**Second Judicial District Court,**

Respondent,

and

**ALBERTO VILLANUEVA CAPRIO,**

Real Party in Interest.

**ORIGINAL PROCEEDING**

Stelzner, Winter, Warburton, Flores, & Dawes, P.A.
Jaime L. Dawes
Albuquerque, NM

for Petitioner

Raúl Torrez, Attorney General
Van Snow, Acting Deputy Solicitor General
Santa Fe, NM

for Respondent

Bennett J. Baur, Chief Public Defender
Maxwell H. Pines, Assistant Public Defender
Rose M. Osborne. Assistant Public Defender
Albuquerque, NM

for Real Party in Interest

**OPINION**

**BACON, Justice.**

**I.      INTRODUCTION**

{1}     These consolidated cases come to the Court on petitions for writs of superintending control. *See Ramirez v. Marsh*, S-1-SC-39966; *N.M. Immigrant L. Ctr. v. Leos*, S-1-SC-40114. Both cases arise out of discovery disputes over criminal defendants' access to their alleged victims' U-Visa and T-Visa (collectively U/T-Visa) applications. Thus, both cases call on this Court to examine the policies and principles underlying 8 U.S.C. § 1367, which sets forth federal privacy standards for U/T-Visa applications, to determine whether such applications should be barred from compelled disclosure by victims in New Mexico state courts.

{2}     In accordance with the policies and principles underlying 8 U.S.C. § 1367, we hold U/T-Visa *applications* are privileged material. Therefore, victims may not be compelled by subpoena to disclose such applications. Additionally, we conclude 89 Fed. Reg. 34864, 34941 (Apr. 30, 2024) (to be codified at 8 C.F.R. § 214.216(c))[1] (hereinafter, § 214.216(c)), which governs privacy standards for agencies in

---

[1]At the time of the district court proceedings, 8 C.F.R. § 214.11(p)(3) (2024). For the purposes of this opinion, we refer to the current regulation, the text of which is unchanged from the previous version.

possession of T-Visa applications, and the attorney-client privilege prevented compelled disclosure of the client file in *Leos*.[2] We grant the writs of superintending control, reverse the district courts' contrary orders in both cases, and direct the Rules of Evidence Committee to craft a new privilege for U/T-Visa applications in accordance with this opinion.

## II.    BACKGROUND

{3}    The consolidated cases share some commonalities. During the discovery process, both defendants, each the real party in interest in the petitions before us, learned their alleged victims had applied for U/T-Visas that allow crime victims to obtain lawful residency in the United States. Both defendants sought access to the corresponding visa application. In both cases, representatives of the victims sought to protect those documents from disclosure. And in both cases, the district courts ultimately ordered production of the respective documents for in-camera review and disclosures to the defendants. Finally, in both cases, the district court rulings were challenged, seeking writs of superintending control from this Court. Because the cases differ in many other respects, we discuss the particulars of each case in turn.

---

[2]New Mexico Immigrant Law Center (NMILC) also argues its client file is protected from disclosure as attorney work-product. Because we hold NMILC's file is protected by the attorney-client privilege, we do not reach this argument regarding attorney work-product.

## A. *Marsh*—Facts and Procedural History in the District Court

{4} In the district court case underlying *Marsh*, the State charged David Paulino Padilla-Suazo with two counts of criminal sexual contact of a minor (CSCM), contrary to NMSA 1978, Section 30-9-13(C)(1) (2003), after the parents of the alleged victim, B.R., reported the allegations of sexual abuse to the police. Police advised B.R.'s parents they could apply for a nonimmigrant U-Visa, which permits victims of serious crime to lawfully reside in the United States for a few years. B.R.'s parents followed the advice and applied for a U-Visa.

{5} Defense counsel conducted a pretrial interview with B.R.'s parents in which counsel "asked if they had applied for citizenship," to which B.R.'s parents replied "that they had not." Later, however, the prosecutor informed defense counsel that B.R.'s parents had applied for U-Visas. Defense counsel issued subpoenas to B.R.'s parents for "'[a]ny and [a]ll applications for visa and or citizenship'" they had submitted "'from July 2017 to present date.'" B.R.'s parents moved to quash the subpoenas through private counsel—an attorney with the New Mexico Victims' Rights Project—on the theory that U-Visa applications are protected from disclosure by federal law.

{6} The district court ultimately denied the motions, noting "the purpose of the request is impeachment" and "the state already conceded that the defense has a right

3

to explore this line of defense." After the ruling, the prosecutor offered as "a compromise" that the district court review the documents in camera and redact any sensitive information. The district court agreed to in-camera review and ordered counsel for B.R.'s parents to turn over the documents within ten days. Counsel for B.R.'s parents informed the district court she did not have the documents in her possession.

{7} Before the ten-day deadline for turning over the documents, counsel for B.R.'s parents filed a verified petition for emergency writ of superintending control and request for stay in this Court. We granted the request for stay, and the district court stayed all proceedings the following day. *See* Order Vacating Settings, *State v. Padilla-Suazo*, D-1116-CR-2020-00835 (11th Jud. Dist. Ct. July 13, 2023).

**B.      *Leos*—Facts and Procedural History in the District Court**

{8} The district court case underlying *Leos* arose when, E.M., a minor, told her high school teacher she was being sexually abused by Alberto Villanueva Caprio (Villanueva Caprio). The teacher gave this information to the Children, Youth & Families Department (CYFD), as required by law. *See* NMSA 1978, § 32A-4-3(A) (2021) (mandating school employees to report child abuse). CYFD contacted the police. A grand jury indicted Villanueva Caprio on three counts of second-degree criminal sexual penetration of a minor (CSPM), contrary to NMSA 1978, Section

4

30-9-11(E)(1) (2009); manufacturing child pornography, contrary to NMSA 1978, Section 30-6A-3(E) (2016); two counts of reckless child abuse, contrary to NMSA 1978, Section 30-6-1(D) (2009); and two counts of threatening a witness, contrary to NMSA 1978, Section 30-24-3 (1997). *See* Grand Jury Indictment, *State v. Villanueva Caprio*, D-202-CR-2021-01400 (2d Jud. Dist. Ct. July 16, 2021).

{9}  In addition to contacting the police, CYFD referred E.M. to New Mexico Immigrant Law Center (NMILC) for legal advice. NMILC assisted E.M. in filing an application for a nonimmigrant T-Visa, which permits victims of severe human trafficking to lawfully reside in the United States for a period of four years.

{10}  During pretrial interviews, defense counsel inquired about E.M.'s efforts to secure legal residency. Defense counsel then filed a motion to compel production of E.M.'s T-Visa application. *See* Def.'s Mot. to Compel Produc. of Materials Related to Alleged Victim's Appl. for Immigration Relief, D-202-CR-2021-01400 (2d Jud. Dist. Ct. Apr. 12, 2023). The State responded that E.M. had answered questions about her T-Visa application in her pretrial interview with defense counsel, and the State had "no information, documents, paper, or knowledge beside what the victim disclosed in her pretrial interview in the state's custody."

{11}  The district court granted the defense's motion to compel, ordering E.M.'s attorney at NMILC "to produce to defense counsel and counsel for the State all

5

materials in her possession pertaining to any immigration relief sought for E.M. . . . within [two] weeks of the issuance of this order." *See* Order Granting in Part Defense Mot. to Compel Immigration Information, D-202-CR-2021-01400 (2d Jud. Dist. Ct. May 17, 2023). To comply with the order, the State subpoenaed the documents from NMILC.

{12}  In response, NMILC filed a motion to quash the subpoena, arguing E.M.'s immigration file was protected by federal law, the attorney-client privilege, and work-product doctrine. *See* NMILC's Mot. to Quash Subpoena Duces Tecum, D-202-CR-2021-01400, 1-2 (2d Jud. Dist. Ct. May 31, 2023). The district court denied the motion to quash and ordered NMILC to furnish the documents. *See* Order Den. Mot. to Quash and Mot. to Reconsider, D-202-CR-2021-01400 (2d Jud. Dist. Ct. Sept. 12, 2023). NMILC filed an emergency petition for writ of superintending control and request for stay in this Court. The day after the trial commenced, we granted the stay and then set the two consolidated cases for oral argument.

**III.  DISCUSSION**

**A.  Superintending Control**

{13}  Petitioners seek writs of superintending control to reverse the district courts' orders compelling the disclosure of the victims' immigration applications. "Our exercise of the power of superintending control is appropriate where necessary to

prevent irreparable mischief, great, extraordinary, or exceptional hardship, or costly delays and unusual burdens of expense." *State v. Wilson*, 2021-NMSC-022, ¶ 14, 489 P.3d 925 (internal quotation marks and citation omitted). Superintending control is an appropriate means by which this Court can resolve questions of privilege or other protections of information in a discovery dispute. *See, e.g.*, *State ex rel. Brandenburg v. Blackmer*, 2005-NMSC-008, ¶¶ 7, 11, 137 N.M. 258, 110 P.3d 66 (resolving dispute over the work-product doctrine through writ of superintending control).

**B.     Standard of Review**

{14}     "The standard of review for discovery orders is abuse of discretion. To the extent a trial court's discretionary decision is premised on the construction of a privilege, however, review of that decision presents a question of law, subject to de novo review." *Pincheira v. Allstate Ins. Co.*, 2007-NMCA-094, ¶ 27, 142 N.M. 283, 164 P.3d 982 (citations omitted); *accord, e.g.*, *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 ("[E]ven when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo. Accordingly, we may characterize as an abuse of discretion a discretionary decision that [is] premised on a misapprehension of the law." (second alteration in original) (internal quotation marks and citations omitted)). To the extent

discovery orders implicate questions of constitutional interpretation, review is de novo. *State v. Boyse*, 2013-NMSC-024, ¶ 8, 303 P.3d 830 ("We review questions of statutory and constitutional interpretation de novo." (brackets, internal quotation marks, and citation omitted)).

**C.      Federal Law Governing U-Visas and T-Visas**

**1.      The U/T-Visa programs**

{15}      U/T-Visas are nonimmigrant visas available to victims of certain crimes. Congress created both U/T-Visas as part of amendments to the Violence Against Women Act (VAWA). *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513(a)(2)(A), 114 Stat. 1533-34 (creating the U-Visa program); *id.* § 107(e)(1)(C), 114 Stat. 1474, 1477 (creating the T-Visa program). The U/T-Visa programs offer similar benefits in that they both permit immigrants who are victims[3] of certain types of crimes to live and work in the country for an initial period of four years. 8 C.F.R. § 214.14(a)(9), (g)(1) (2024) (making available a four-year U-Visa for victims of certain categories of crimes, including abusive sexual contact); 8 C.F.R. § 214.203(a) and § 214.206(a)(1)-(3) (2024) (making

---

[3]Family members of victims are eligible to receive the same benefits as victims if they meet certain criteria. *See* 8 C.F.R. § 214.14 (a)(10), (d)(2), (f) (2024) (providing U-Visa eligibility criteria for qualifying family members); *see also* 8 C.F.R. § 214.11(c)(2), (k) (2024) (providing same, T-Visa context).

available a four-year T-Visa for victims of "a severe form" of human trafficking). After a recipient of either visa has resided in the United States for a period of three years, he or she may apply for permanent residency. *See* 8 U.S.C. § 1255(m)(1)(A) (U-Visa recipients); *see also* 8 U.S.C. § 1255(l)(1)(A) (T-Visa recipients).

{16} The U/T-Visa programs differ somewhat in their eligibility requirements and application procedures. *See generally* Michael Kagan, *Immigrant Victims, Immigrant Accusers*, 48 U. Mich. J.L. Reform 915, 962-63 (2015) (comparing both programs as they address victims of trafficking). The salient difference is the U-Visa requires the victim to potentially cooperate in the prosecution, whereas the T-Visa—for minor victims—does not. *Compare* 8 U.S.C. § 1101(a)(15)(U)(i)(III) (requiring U-Visa recipient to be "helpful, or . . . likely to be helpful" to the "investiga[tion] or prosecut[ion of] criminal activity"), *with* 8 U.S.C. § 1101(a)(15)(T)(i)(III)(cc) (exempting T-Visa recipients under the age of 18 from the requirement to cooperate with law enforcement). Therefore, unlike a T-Visa application, a U-Visa application must include a certification from a law enforcement agency—the "'U Nonimmigrant Status Certification'"—attesting to the applicant's helpfulness. 8 C.F.R. § 214.14(a)(2), (a)(12), (c)(2)(i) (2024). Notwithstanding these differences, both U/T-Visa applications both contain sensitive information about the applicant: immigration status, physical address, safe mailing address, current locations of their

immediate family members, and extensive personally identifiable information including social security, alien registration, USCIS account, and passport numbers. Additionally, both applications require the applicant to confirm or deny their involvement in a variety of activities ranging from drug use to membership in a communist party, and to confirm or deny whether they suffer from conditions including substance addiction and communicable diseases.

**2. Confidentiality of U/T-Visa information**

{17} The confidentiality of U/T-Visa applications is protected by 8 U.S.C. § 1367. That section, titled "[p]enalties for disclosure of information," provides in relevant part that

> *in no case* may the Attorney General, or any other official or employee of the Department of Justice, the Secretary of Homeland Security, the Secretary of State, or any other official or employee of the Department of Homeland Security or Department of State (including any bureau or agency of either of such Departments)
>
> . . .
>
> *permit use by or disclosure to anyone* (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under paragraph (15)(T) [ or] (15)(U) . . . of section 101(a) of the Immigration and Nationality Act (8 U.S.C. § 1101a . . . ) [the T-Visa or U-Visa]. . . .

8 U.S.C. § 1367(a)(2) (emphasis added).

{18}  8 U.S.C. § 1367(b) provides eight exceptions to the nondisclosure rule, seven of which are undisputedly irrelevant in this case. The only exception in dispute is 8 U.S.C. § 1367(b)(2), which states:

> The Secretary of Homeland Security or the Attorney General may provide in the discretion of the Secretary or the Attorney General for the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose in a manner that protects the confidentiality of such information.

{19}  Federal regulations further prohibit non-governmental agencies from disclosing information about U/T-Visa recipients. *See* 8 C.F.R. § 214.216(c) ("Agencies receiving information [relating to the beneficiary of a pending or approved T-Visa application], whether governmental or non-governmental, are bound by the confidentiality provisions and other restrictions set out in 8 U.S.C. [§] 1367."); 8 C.F.R. § 214.14(e)(2) (2024) (applying the same provision to U-Visa applications). The penalty for willful disclosure of U/T-Visa information is "appropriate disciplinary action" and a fine of up to $5,000 per occurrence. 8 U.S.C. § 1367(c).

## IV.  ANALYSIS

{20}  Petitioners in both cases, joined by amici, urge this Court to interpret 8 U.S.C. § 1367 as a categorical bar on disclosure of U/T-Visa applications, as opposed to only barring disclosure by certain federal employees. Additionally, Petitioners claim

11

no 8 U.S.C. § 1367(b) exception applies. NMILC further argues that because 8 C.F.R. § 214.216(c) specifically prohibits non-governmental agencies from disclosing T-Visa information, it was error for the district court to compel NMILC to disclose such information. Both Petitioners also argue the criminal defendants in their respective cases were not entitled to the victims' visa applications because the applications were not in the prosecution's possession and consequently were not subject to discovery pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Finally, NMILC argues the T-Visa application at issue constitutes a privileged attorney-client communication, and so the subpoena requiring disclosure should have been quashed.

{21}    Below, we begin by examining the policy supporting 8 U.S.C. § 1367. We conclude the polices and principles underlying 8 U.S.C. § 1367 support robust protection of U/T-Visa applicants' privacy, and that this protection is best expressed as an evidentiary privilege; accordingly, we need not reach the question of whether 8 U.S.C. § 1367 itself provides a categorical bar to disclosure of U/T-Visa applications that would prohibit compelled disclosure of an application from an alleged victim. Next, we examine 8 C.F.R. § 214.216(c) and explain how that regulation provides an additional bar to disclosure of the T-Visa application by NMILC. Then, we turn to Petitioners' *Brady* arguments. In addition to addressing

due process concerns under *Brady*, we offer clarity on how our holding intersects with defendants' constitutional rights to compulsory process and confrontation. Finally, we discuss NMILC's argument that the T-Visa application is protected as a privileged communication.

**A.    The Policies and Principles Underlying 8 U.S.C. § 1367 Lead Us to Hold U/T-Visa Applications Are Privileged Material**

{22}    The law is not settled as to whether 8 U.S.C. § 1367 applies to all individuals or only certain federal employees. Again, we need not answer this question, nor address whether an 8 U.S.C. § 1367(b) exception applies, because our holding in these consolidated cases creates an evidentiary privilege that prohibits compelled disclosure of U/T-Visa applications from victims. However, examining other courts' analysis of 8 U.S.C. § 1367 informs our holding.

{23}    Courts that interpret 8 U.S.C. § 1367 as a categorical bar to obtaining U/T-Visa applications in discovery often reason that compelling a victim to disclose their application to their alleged offender would run contrary to the purpose of the statute, which is to safeguard victims' information. *See, e.g.*, *Demaj v. Sakaj*, No. 3:09 CV 255 (JGM), at 11 (D. Conn. Feb. 14, 2012) (ruling on petitioner's motion to compel) (concluding compelled production of a U-Visa application from the victim was improper because the "disclosure of these documents for [impeachment purposes] runs contrary to the intent of the protections afforded by 8 U.S.C. § 1367, the purpose

13

of which is to protect the confidentiality of the applications by preventing disclosure of these documents to alleged criminals" (footnote omitted)); *Commonwealth v. Riojas*, No. CP-28-CR-0002169-2012, at 24 (Ct. Comm. Pleas Jan. 2, 2015) (opinion affirming judgment)[4] (concluding that "even though 8 U.S.C. § 1367 specifically prohibits government officials from disclosing information pertaining to U-Visas, requiring disclosure from the applicant would be contrary to the purpose of the statute which is to protect the confidentiality of the applications by preventing disclosure of these documents to alleged criminals" (internal quotation marks and citation omitted)); *cf. Hawke v. U.S. Dep't of Homeland Sec.*, No. C-07-03456 RMW, at 10 (N.D. Cal. Sept. 29, 2008) (order denying first amended petition) (noting that "one of the primary purposes of the VAWA confidentiality provision" is "to prohibit disclosure of confidential application materials to the accused batterer"). In addition to this reasoning, the *Riojas* Court also recognized that none of the exceptions in 8 U.S.C. § 1367(b)(2) "involve disclosure of information to a defendant in a criminal case, nor do any of them give the Court any discretion to

---

[4]This opinion was appended to an unpublished appellate court decision under *Commonwealth v. Riojas*, No. 2038 MDA 2015, J-S58013-16 (Pa. Super. Ct. Sept. 7, 2016) (nonprecedential).

14

permit disclosure of the application or any information pertaining to a U-Visa application." *Riojas*, No. CP-28-CR-0002169-2012, at 23.

{24}    Conversely, the Fifth Circuit came to the opposite conclusion in strict reliance on the statutory text. *See Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 552-53 (5th Cir. 2016). There the Fifth Circuit held, "Section 1367 and its implementing regulation clearly preclude discovery from the [agency], but they just as clearly do *not* preclude discovery from the individual claimants. . . . It must therefore be read not to preclude such disclosure." *Id.* at 552 (footnote omitted).

{25}    After examining other courts' interpretations of 8 U.S.C. § 1367, we conclude the policies and principles underlying 8 U.S.C. § 1367 support a broad prohibition on discovery of U/T-Visa applications. Therefore, we hold U/T-Visa applications are materials warranting an evidentiary privilege. As the holders of the privilege, victims may refuse to produce their U/T-Visa application, and a subpoena compelling production of any such application must be quashed pursuant to Rule 5-511(C)(3)(a)(iii) NMRA. This follows logically in light of the potential chilling effect a contrary rule might have on immigrants' willingness to report crimes.

{26}    Like all privileges, a victim can waive the privilege not to disclose a U/T-Visa application. Rule 11-511 NMRA states, "[a] person who possesses a privilege against disclosure of a confidential matter or communication waives the privilege if

15

the person voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This rule does not apply if the disclosure is a privileged communication." We hold in the context of U/T-Visa applications that necessary disclosure to law enforcement in order to complete the application is not, in itself, waiver. Nor is disclosure in discovery by the applicant of the fact of a U/T-Visa application a waiver.

**B.      8 C.F.R. § 214.216(c) Presents an Additional Bar to NMILC's Disclosure of the T-Visa Application**

{27}     In *Leos*, NMILC contends 8 C.F.R. § 214.216(c) prohibits NMILC from disclosing the T-Visa at issue. That regulation states, "Agencies receiving information under this section, whether governmental or non-governmental, are bound by the confidentiality provisions and other restrictions set out in 8 U.S.C. [§] 1367." 8 C.F.R. § 214.216(c). Although Defendant Villanueva Caprio argues 8 U.S.C. § 1367 only applies to federal employees, his brief is silent on whether 8 C.F.R. § 214.216(c) applies to NMILC as a non-governmental agency. Because there is no dispute that NMILC is an "agenc[y] receiving information" under the T-Visa program, we conclude 8 C.F.R. § 214.216(c) prohibits NMILC from releasing the T-Visa application, as a subpoena requiring release compels NMILC to violate federal law. Consequently, the subpoena unduly burdens NMILC and must be quashed under Rule 5-511(C)(3)(a)(iv).

16

{28}   Our conclusion abides with the straightforward result reached in *Cazorla* with regard to the agency involved in that case: the Equal Employment Opportunity Commission (EEOC). The *Cazorla* Court held the confidentiality requirement under the analogous federal regulation for U-Visa information, when read together with 8 U.S.C. § 1367, "was unambiguous: because the EEOC is an 'agenc[y] receiving information' under the [U-Visa] program, it is 'bound' by § 1367's confidentiality provisions, and in turn, it may not 'permit use by or disclosure to anyone . . . of any information which relates to' a [U-Visa] applicant." *Cazorla*, 838 F.3d at 551. Therefore, the *Cazorla* Court held, "To comply with [the defendant's] discovery requests would necessarily violate this command." *Id.*

**C.   Due Process Requires the Government to Disclose Exculpatory Evidence in Its Possession but Does Not Impose Any Duty on Third Parties**

{29}   "There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Further, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded." *Wardius v. Oregon*, 412 U.S. 470, 474 (1973). Nevertheless, Respondents rely on due process cases as the basis for their right to subpoena the U/T-Visa applications.

{30}   The government's discovery obligation under the Due Process Clause of the Fourteenth Amendment was first articulated in *Brady*, in which the United States

17

Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Later, the United States Supreme Court clarified impeachment evidence is subject to *Brady*'s disclosure requirement just as much as other exculpatory evidence. *See Giglio v. United States*, 405 U.S. 150, 153-55 (1972); *see also, e.g.*, *United States v. Bagley*, 473 U.S. 667, 676 (1985) (explaining impeachment "evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal" (citation omitted)).

{31} However, the *Brady* rule is limited to material evidence. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley*, 473 U.S. at 675 (footnote omitted). New Mexico courts have explained the *Bagley* materiality standard as follows: "[E]vidence is material when there is a realistic basis, beyond extrapolated speculation, for supposing that availability of the lost evidence would have undercut the prosecution's case." *State v. Chavez*, 1993-NMCA-102, ¶ 21, 116 N.M. 807, 867 P.2d 1189 (internal quotation marks and citation omitted). This materiality requirement means *Brady* did not

18

create a blanket discovery right. In *Bagley*, the United States Supreme Court emphatically rejected "[a]n interpretation of *Brady* to create a broad, constitutionally required right of discovery," stating that such a rule "would entirely alter the character and balance of our present systems of criminal justice." 473 U.S. at 675 n.7 (internal quotation marks and citation omitted).

{32} Additionally, the *Brady* rule applies only to material evidence *in the possession of the prosecution*. For purposes of *Brady*, "the prosecution" includes all members of the prosecution team, which has been defined as "the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects of the case." *Case v. Hatch*, 2008-NMSC-024, ¶ 46, 144 N.M. 20, 183 P.3d 905 (text only)[5] (citation omitted). At the outer limits, then, due process imposes a duty on the "other arms of the state involved in investigative aspects of the case," *id.*, but does not impose any duty on a non-governmental third party, such as involved here. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 43, 61 (1987) (holding that the state of Pennsylvania's "protective service agency charged with

---

[5]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

investigating cases of suspected mistreatment and neglect" was obligated to turn over potentially material evidence for "*in camera* review by the trial court").

{33}    Accordingly, we conclude due process and *Brady* require the following in the U/T-Visa context. First, the prosecution is required—if it is aware—to disclose the fact an alleged victim or victim's family applied for a U/T-Visa application because the fact of a U/T-Visa application is relevant impeachment material. *See, e.g.*, *Roldan v. Town of Cicero*, No. 17-cv-03707, at 20 (N.D. Ill. Aug. 19, 2021) (memorandum opinion and order) ("Irrespective of whether the agreement concerned a U-Visa application or some other type of immigration benefit, it is, in the [c]ourt's view, 'beyond debate' that the agreement itself is *Brady/Giglio* material.").

{34}    Second, if the prosecution—or an arm of the prosecution—is in possession of the U/T-Visa application itself, *Brady* is implicated to the extent information within the application "is material either to guilt or to punishment." *See Brady*, 373 U.S. at 87; *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

government's behalf in the case, including the police.").[6] If information within the U/T-Visa application is material, then the information—not the application—should be disclosed to the defendant. *Cf. United States v. Kohring*, 637 F.3d 895, 898, 908-10 (9th Cir. 2011) (holding the prosecutor had a *Brady* obligation to share noncumulative exculpatory facts in the prosecutor's email that constituted opinion work-product but did not have an obligation to disclose the email itself). If materiality is contested, in-camera review by the trial court is appropriate to determine materiality.

**D.     Compulsory Process Does Not Create a Right to Subpoena Documents; It Provides a Discovery Right Coextensive with Due Process**

{35}     The Compulsory Process Clause of the Sixth Amendment of the United States Constitution, applicable to the states by the due process clause of the Fourteenth Amendment, *Washington v. Texas*, 388 U.S. 14, 19 (1967), provides "the right to the government's assistance in compelling the attendance of favorable witnesses at trial" but has never been interpreted as an independent basis "to require the government to produce exculpatory evidence." *Ritchie*, 480 U.S. at 56 (footnote omitted); *see*

---

[6]To the extent that *State v. Huerta-Castro* concluded the contents of a U-Visa application were material because the fact of the application was material, 2017-NMCA-026, ¶¶ 45-46, 390 P.3d 185, it was wrongly decided.

21

U.S. Const. amend. VI (recognizing the defendant's right "to have compulsory process for obtaining witnesses in his favor").

{36}   The *Ritchie* Court concluded "that compulsory process provides no greater protections in this area than those afforded by due process" and therefore analyzed the defendant's right to pretrial discovery of documents under the due process standard set forth in *Brady*. *Ritchie*, 480 U.S. at 56 (emphasis omitted). Therefore, we conclude the due process framework, discussed above, is appropriate for determining the extent to which a defendant has a right to pretrial discovery of U/T-Visa information.

**E.     The Confrontation Clause Requires the Defendant Be Permitted to Cross-Examine a Victim About the Fact of a U/T-Visa Application; It Provides No Further Right to Discovery of the Application**

{37}   The Confrontation Clause of the Sixth Amendment of the United States Constitution, applicable to the states by the due process clause of the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), provides a criminal defendant the right to face and cross-examine those who testify against them. *See Ritchie*, 480 U.S. at 51. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. . . . [T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to

impeach, i.e., discredit, the witness." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Impeachment may be of a general nature, or it may be more specifically "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial[] and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Id.* (quoting 3A J. Wigmore, *Evidence* § 940, at 770 (Chadbourn rev. 1970)). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316-17 (citation omitted). Specific impeachment evidence that goes to a witness's improper motive, such as bias, cannot be withheld from the jury. *See id.* at 318. However, the trial court can set "reasonable limits" on the scope of cross-examination in consideration of, "among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *State v. Montoya*, 2014-NMSC-032, ¶ 47, 333 P.3d 935 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

{38} Applying the cross-examination standard set forth in *Davis* to the context of U/T-Visas, we conclude the defense may impeach the victim's credibility by cross-examining the victim about the potential benefits that a U/T-Visa offers to a victim, acknowledging these benefits are significant and could provide ulterior motives. *See*

*generally* Kagan, *supra*, at 945 (discussing the tensions inherent in the U/T-Visa system whereby the mechanisms established to protect victims and incentivize truthful reporting also serve to cast suspicion on all U/T-Visa applicants). Thus, the defendant has a constitutional right to attempt to expose these potential motives through vigorous cross-examination. Therefore, because the fact of a U/T-Visa application is relevant to the victim's motive, a defendant may: cross-examine witnesses, including victims, as to their knowledge and participation in the U/T-Visa application process and their reasons for their involvement; impeach a witness with prior inconsistent statements on the topic; educate the jury about what a U/T-Visa is and the benefits it offers through cross-examination of the state's witnesses or direct examination of defense witnesses; and make related closing arguments.

{39}    The weight of authority from other jurisdictions bears this out. While many opinions on this topic are nonprecedential or the error was found to be harmless, the majority of courts hold a defendant has the right to present to the jury the fact that a victim has applied for a U-Visa or a T-Visa. *See, e.g.*, *State v. Quintero*, No. 35752-0-III, at 11-14, 17 (Wash. Ct. App. Jan. 7, 2020) (unpublished opinion) (stating, in dicta, it would be error to prohibit cross-examination on fact of a U-Visa in a case where the victim had actually applied for a U-Visa); *see also Romero-Perez v. Commonwealth*, 492 S.W.3d 902, 906-08 (Ky. Ct. App. 2016) (holding the district

court erred by preventing defendant from asking whether victim had applied for a U-Visa, but the error was harmless); *State v. Perez-Aguilera*, No. 110983, at 6-7 (Kan. Ct. App. Mar. 27, 2015) (memorandum opinion) (holding it was harmless error to prevent defense counsel from cross-examining the victim about a U-Visa application); *State v. Valle*, 298 P.3d 1237, 1240, 1244 (Or. Ct. App. 2013) (holding the fact of a U-Visa "was relevant impeachment evidence" and its exclusion was not harmless error).

{40}   Nevertheless, the right to confrontation is not implicated when the trial court quashes a subpoena duces tecum. The Confrontation Clause did not create "a constitutionally compelled rule of pretrial discovery." *Ritchie*, 480 U.S. at 52. "The ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Ritchie*, 480 U.S. at 53 (footnote omitted).

{41}   In *Ritchie*, the United States Supreme Court determined the Confrontation Clause was not violated when the trial court denied the defendant pretrial access to the victim's medical records that were held by Pennsylvania's protective service agency. 480 U.S. at 54. "[I]t only would have been impermissible for the judge to have prevented Ritchie's lawyer from cross-examining the [victim]. Because defense counsel was able to cross-examine all of the trial witnesses fully," including

the victim, the *Ritchie* Court held "the Pennsylvania Supreme Court erred in holding that the failure to disclose the [state's agency] file violated the Confrontation Clause." 480 U.S. at 54.

{42}     Accordingly, courts have held allowing a defendant to introduce the fact of a U/T-Visa application satisfies the defendant's confrontation rights, and a defendant does not have an additional right to inspect the application materials themselves. *See, e.g.*, *State v. Marroquin-Aldana*, 2014 ME 47, ¶¶ 37-38, 89 A.3d 519 (concluding the defendant's rights were satisfied by vigorous cross-examination of the victim about her U-Visa application, and the defendant's request for the entire file of the victim's immigration attorney "bears the hallmarks of an impermissible fishing expedition"); *see also Riojas,* No. CP-28-CR-0002169-2012, at 23, (affirming the trial court's grant of the motion to quash the defendant's subpoena of the U-Visa application because "[t]he Confrontation Clause does not constitutionally guarantee access to pre-trial discovery" (internal quotation marks and citation omitted)); *cf. United States v. Brown*, 347 F.3d 1095, 1098-99 (9th Cir. 2003) (holding the defendant's "thorough cross-examination" of the witness about his "strong incentive to curry favor with the government by providing information about drug dealers" satisfied the defendant's Sixth Amendment rights, "even without the benefit of [the witness's] complete" immigration file). We agree, and hold the

26

Confrontation Clause entitles a defendant to cross examine about the fact of a U/T-Visa application but grants no discovery right of the application.

**F. The Attorney-Client Privilege Posed an Additional Bar to the Compelled Disclosure in *Leos***

{43} Privilege operates as an exception to the general rule that "the public has a right to every man's evidence." *Albuquerque Rape Crisis Ctr. v. Blackmer*, 2005-NMSC-032, ¶ 18, 138 N.M. 398, 120 P.3d 820 (text only) (citation omitted). New Mexico only recognizes evidentiary privileges that are "required by the constitution, these rules, or other rules adopted by the supreme court." Rule 11-501 NMRA. A subpoena seeking privileged information must be quashed. *See* Rule 5-511(C)(3)(a)(iii). Privileged information that was compelled erroneously is not admissible. Rule 11-512(A) NMRA.

{44} Here, the attorney-client privilege posed an additional bar to the compelled disclosure of NMILC's client file in *Leos*. New Mexico's attorney-client privilege is set forth in Rule 11-503(B)(1) NMRA, which provides, "[a] client has a privilege to refuse to disclose, and to prevent any other person from disclosing, a confidential communication made for the purpose of facilitating or providing professional legal services to that client . . . between the client and the client's lawyer or representative." "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524

U.S. 399, 403 (1998) (citation omitted); *see also* 1 McCormick on Evid. § 87 (8th ed. 2020) ("The notion that the loyalty owed by the lawyer to his client disables him from being a witness in his client's case is deep-rooted in Roman law."). "Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged. The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." *Fisher v. United States*, 425 U.S. 391, 403 (1976) (citations omitted).

{45}    In *Leos*, the district court compelled an attorney to produce a client file. An attorney's client file contains the quintessential "confidential communication[s] . . . between the client and the client's lawyer" which the privilege is meant to protect. Rule 11-503(B)(1). Defendant Villanueva Caprio makes no attempt to argue the privilege did not apply. More importantly, the district court did not offer any reasoning as to why the privilege did not apply. *See* Order Den. Mot. to Quash, D-202-CR-2021-01400 (2d Jud. Dist. Ct. Sept. 12, 2023). The order simply states the district court "reviewed the pleadings and argument of counsel" and "hereby denies the Motion." *Id.*

{46}    As the privilege applies and was invoked, the district court erred by ordering NMILC to produce privileged documents. We recognize that in extraordinary circumstances, a criminal defendant's need for certain evidence may prevail over a

28

privilege-holder's claim of privilege. *See* Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges*, § 11.3 (2002) (explaining that when determining whether a defendant's constitutional right to present evidence surmounts exclusionary rules of evidence such as privileges, a court weighs the policy considerations of the exclusionary rule against the strength of the accused's interest in presenting the evidence, with the strength of the interest gauged by evaluating factors including the availability of alternative, admissible evidence; the importance of the issue the item of evidence is relevant to prove; the probative value of the item of evidence on the issue it is relevant to; and the reliability of the item of evidence barred by the exclusionary rule). However, no such showing was made in this case, and a mere assertion the T-Visa application could possibly contain exculpatory or impeaching evidence cannot defeat the attorney-client privilege.

## V. CONCLUSION

{47} In sum, and in accordance with the principled policies underlying 8 U.S.C. § 1367, we hold U/T-Visa applications are privileged material and the subpoenas requiring their disclosure must be quashed. Further, we hold 8 C.F.R. § 214.216(c) and attorney-client privilege prohibited disclosure of the client file in *Leos*. Therefore, we grant the writs of superintending control and reverse the district courts' orders in both consolidated cases. We direct the Rules of Evidence

29

Committee to draft a new privilege for U/T-Visa applications consistent with this opinion.

{48}   **IT IS SO ORDERED.**

_____
                                            **C. SHANNON BACON, Justice**

**WE CONCUR:**

_____
**DAVID K. THOMSON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**JULIE J. VARGAS, Justice**

_____
**BRIANA H. ZAMORA, Justice**